## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| PHILIP MCCONNELL, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> APPLIED DIGITAL CORPORATION, WESLEY CUMMINS, and DAVID RENCH, <br><br> Defendants. | **Case No.  3:23-cv-1805** <br><br><br> **CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Philip McConnell ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Applied Digital Corporation ("Applied Digital" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Applied Digital securities

between April 13, 2022 and July 26, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Applied Digital, originally known as Applied Blockchain, designs, develops, and operates datacenters in North America, and provides artificial intelligence ("AI") cloud services, computing datacenter hosting, and crypto datacenter hosting services.

3.      In April 2022, Applied Digital conducted its initial public offering ("IPO"), issuing 8 million shares of common stock priced at $5.00 per share for a total of approximately $40 million in proceeds.   The primary underwriter of the IPO was B. Riley Securities, Inc. ("B. Riley Securities"), an investment bank and subsidiary of the diversified financial services platform B. Riley Financial, Inc. ("B. Riley Financial").[1]   On April 13, 2022, pursuant to the offering documents issued in connection with the IPO (the "Offering Documents"), Applied Digital's securities began trading on the Nasdaq Global Select Market ("NASDAQ").

4.      The Offering Documents described several close connections between Applied Digital and B. Riley.   For example, in the "conflicts of interest" section of the IPO Prospectus, Applied Digital stated that, in August 2021, the Company's Chief Executive Officer ("CEO"), Defendant Wesley Cummins ("Cummins"), sold a majority interest in a registered investment adviser controlled by Cummins to B. Riley Financial, and thereafter became President of B. Riley Asset Management.   At the time of the IPO, Cummins also served as the CEO and President of B. Riley Capital Management, LLC.   Further, the IPO Prospectus stated that two members of the

---

[1] B. Riley Financial and its subsidiaries B. Riley Securities, B. Riley Asset Management, B. Riley Capital Management, LLC, B. Riley Wealth Management, Inc., and B. Riley Commercial Capital, LLC are sometimes referred to herein collectively as "B. Riley".

Board, Chuck Hastings ("Hastings") and Virginia Moore ("Moore"), maintained similarly close connections to B. Riley.  Specifically, at the time of the IPO, Hastings served as the CEO of B. Riley Wealth Management, Inc. and Moore was married to the CEO of B. Riley Securities.

5.      As a company publicly traded on the NASDAQ, Applied Digital is required to comply with Listing Rule 5605(b)(2), which states that a majority of the Company's board of directors (the "Board") must be comprised of independent directors.  Nasdaq Listing Rule 5606(a)(2) defines an independent director as "a person other than an Executive Officer or employee of the Company or any other individual having a relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director."  Notwithstanding the close ties between Applied Digital and B. Riley, the prospectus issued in connection with the IPO (the "IPO Prospectus") nonetheless assured investors that Applied Digital had "structured [its] Board composition and corporate governance in order to meet the requirements of the [NASDAQ]".

6.      On May 15, 2023, Applied Digital announced that it was launching cloud service to "[e]mpower [a]rtificial [i]ntelligence [a]pplications".  Eight days later, on May 23, 2023, Applied Digital entered into a loan and security agreement with B. Riley Commercial Capital, LLC and B. Riley Securities.  The agreement, the purpose of which Applied Digital claimed was to supply "additional liquidity to fund the buildout of the Company's recently announced AI cloud platform and datacenters by the Company," provided for a term loan in the principal amount of up to $50 million, with an interest rate of 9.00% per annum, and a maturity date of May 23, 2025.  However, Applied Digital repaid the total balance of the loan nearly two years ahead of its contractual maturity, a timeframe that corresponded with B. Riley's own efforts to finance its recent acquisition of the holding company Franchise Group, Inc.

7.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Applied Digital had overstated the profitability of its datacenter hosting business and its ability to successfully transition into a low-cost AI Cloud services provider; (ii) Applied Digital's Board of Directors was not independent within the meaning of NASDAQ listing rules; (iii) accordingly, Applied Digital had overstated the efficacy of its business model and failed to maintain proper corporate governance standards; (iv) the foregoing, once revealed, was likely to subject the Company to significant financial and/or reputational harm; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

8.      In July 2023, market analysts began scrutinizing Applied Digital's business model as well as assembling the various connections between Applied Digital and B. Riley into a cogent picture.  First, on July 6, 2023, market analysts Wolfpack Research ("Wolfpack") and The Bear Cave ("Bear Cave") published short reports on Applied Digital.  The Wolfpack report raised questions about the viability of the Company's business model, stating, for example, that the Company "pumped up its stock in May by claiming to pivot from a floundering business hosting bitcoin miners, to becoming a low-cost AI Cloud service provider," and "[t]he explosion of interest in AI after the emergence of Chat GPT has predictably attracted the worst promoters []to peddle fake AI wares to credulous investors, and our analysis indicates that APLD is one of these grifters because it is not an AI company[.]"  The Bear Cave report, for its part, detailed Applied Digital's problematic corporate history, alleging that "Applied Digital relies on puffery over substance and is a perfect case study on our market's bizarre underbelly of reverse mergers, microcaps, and shell companies."

4

9.      Following publication of the Wolfpack and Bear Cave short reports, Applied Digital's stock price fell $1.27 per share, or 14.16%, to close at $7.70 per share on July 6, 2023.

10.     Finally, on July 26, 2023, The Friendly Bear published a short report on Applied Digital.  The Friendly Bear report expressed the view that B. Riley "is controlling managerial decisions at Applied Digital to the detriment of Applied Digital shareholders"; that Applied Digital's board does not "meet[] the independence requirements under Nasdaq rules and . . . is essentially controlled by B. Riley."  The Friendly Bear report also alleged that clear conflicts of interest undermined the Company's purported investigation into sexual harassment claims made against Defendant Cummins the previous month, noting that the manner in which the claims were summarily dismissed by Applied Digital's Audit Committee could subject Applied Digital to "significant legal blowback."

11.     Following publication of the Friendly Bear Report, Applied Digital's stock price fell $0.60 per share, or 6%, over the following two trading sessions, to close at $9.40 per share on July 28, 2023.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

15.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Applied Digital is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

17.     Plaintiff, as set forth in the attached Certification, acquired Applied Digital securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18.     Defendant Applied Digital Corporation is a Nevada corporation with principal executive offices located at 3811 Turtle Creek, Blvd, Suite 2100, Dallas, Texas 75219.  Applied Digital's common stock trades in an efficient market on the NASDAQ under the ticker symbol "APLD".

19.     Defendant Wesley Cummins  has served as Applied Digital's CEO at all relevant times.

20.     Defendant David Rench ("Rench") has served as Applied Digital's Chief Financial Officer at all relevant times.

21.     Defendants Cummins and Rench are sometimes referred to herein as the "Individual Defendants."

22.     The Individual Defendants possessed the power and authority to control the contents of Applied Digital's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Applied Digital's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Applied Digital, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

23.     Applied Digital and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

24.     Applied Digital, originally known as Applied Blockchain, designs, develops, and operates datacenters in North America, and provides artificial intelligence cloud services, computing datacenter hosting, and crypto datacenter hosting services.  In April 2022, Applied Digital conducted its IPO, issuing 8 million shares of common stock priced at $5.00 per share for a total of approximately $40 million in proceeds.  B. Riley securities was the primary underwriter of the Company's IPO.

### Materially False and Misleading Statements Issued During the Class Period

25.     The Class Period begins on April 13, 2022, when Applied Digital's securities began trading publicly on the NASDAQ.  In connection with the IPO, Applied Digital filed a Prospectus

on Form 424(b)(4) with the SEC (the "IPO Prospectus").  In describing the Company's hosting

operation, the IPO Prospectus stated, in relevant part:

> We are building Next-Gen datacenters which are designed to provide massive computing power. Initially, these datacenters will primarily host servers securing the Bitcoin network but can also host hardware for other applications such as artificial intelligence, machine learning and other blockchain networks in the future. We have a colocation business model where our customers place hardware they own into our facilities and we provide full operational and maintenance services for a fixed fee. We typically enter into long term fixed rate contracts with our customers.

26.     Further, the IPO Prospectus touted the Company's "competitive strengths" and

"growth strategies," stating, in relevant part:

> *Hosting provides predictable, recurring revenue and cash flow to complement more volatile mining operations*.   The financial performance of mining operations is linked to the value of the underlying cryptocurrencies mined, which can result in volatility in financial results. However, through our Amended and Restated Electric Service Agreement with a utility in the upper Midwest, we have locked in a ceiling for our energy costs. The Amended and Restated Electric Service Agreement has also enabled us to launch our hosting business with long-term customer contracts. Cambridge Bitcoin Electricity Consumption Index reported that as of February 1, 2021 more than 6GW of Bitcoin was mined in China (or $4.3 billion of power cost, assuming $0.08 per kWh average hosting cost). China has since banned cryptoasset mining related activity. We expect much of the demand for hosting locations previously met in China will move to the United States due to its reliable power options. We intend for the steady cash flows generated by our hosting operations to be reinvested into the hosting business.

> *Strong management team and board of advisors with deep experience in crypto mining and hosting operations*.   We have recently expanded our leadership team by attracting top talent in the crypto mining and hosting space. Recent hires from both publicly traded and private company competitors have allowed us to build a team capable of designing hosting datacenters, constructing hosting facilities, and efficiently running mining operations at scale. In addition, our board of advisors includes luminaries in the crypto space, including the co-founders of SparkPool and GMR.

> ***

> *Vertically integrate power assets*.   With recent additions to our management team, we are increasingly looking at various types of power assets to support the growth of our mining and hosting operations. This also includes power

generation assets, which longer-term could be used to reduce our cost of power. Our management team has experience not only in evaluating and acquiring power assets, but also in the conversion of power assets to crypto mining/hosting operations and the construction of datacenters with the specific purpose of mining crypto currency assets.

27.     In addition, in discussing the composition of the Board, the IPO Prospectus stated, in relevant part:

Our board of directors currently consists of seven members. Until we are listed on a national securities exchange, we will not be required to meet the corporate governance requirements of a national securities exchange ***but we have structured our Board composition and corporate governance in order to meet the requirements of the Nasdaq Global Select Market***."

28.     Finally, in describing the committees of the Board, the IPO Prospectus stated, in relevant part:

Our Board has established an audit committee, a compensation committee, and a nominating and governance committee, each of which have the composition and responsibilities described below. Members serve on these committees until their resignation or until otherwise determined by our Board. ***Each committee operates under a written charter approved by our Board that satisfies the applicable rules of the SEC and the listing standards of the Nasdaq Global Select Market***.

29.     On May 13, 2022, Applied Digital issued a press release announcing the Company's fiscal Q3 2022 financial results and providing an operational update.  The press release stated, in relevant part:

"We are now building Applied Blockchain to be the leading provider of next-gen datacenters that are designed to provide massive computing power," said [Defendant] Cummins. "We went from breaking ground to opening our first facility in under six months, demonstrating the capabilities of our operationally focused and experienced team. We also entered into a significant JV with Antpool, an affiliate of Bitmain, to build up to 1.5GW of co-hosting capacity. Our strong partnerships with companies like Bitmain validate our business model, which we expect to provide stronger risk-adjusted returns than many other cryptocurrency focused business models."

"Our IPO enhanced our capital position to execute on our significant growth opportunities as we plan to grow our business to 800MW by May 2023, 1.8GW by

the end of fiscal 2024 (ending May 31, 2024) and 5GW over the next five years. We see substantial demand for our services and in the near-term are laser focused on executing on our next facilities, including our first sites in Texas and expansion in North Dakota."

30.     That same day, Applied Digital hosted an earnings call with investors and analysts to discuss the Company's Q3 2022 results (the "Q3 2022 Earnings Call").  During the scripted portion of the Q3 2022 Earnings Call, Defendant Cummins stated, in relevant part:

We currently have long-term contracts mostly five years with our customers, but we plan to have a mix of long-term contracts of three to five years with larger blue chip counterparties and short-term contracts of 18 to 36 months for smaller customers at future facilities to maximize margin, while maintaining stability. We expect our hosting business model to provide secure long-term predictable recurring revenue and cash flow given the contractual structures of both our revenue and costs. This unique model and structure will provide investors with differentiated exposure to the crypto industry as our results are not directly correlated to the price of any cryptocurrency yet; we can participate in the expected massive growth of power demand required by these industry participants.

***

[W]e have assembled a strong team of dedicated power infrastructure experts with proficiency in design, building, and operating next-gen datacenters. I will put our team up against anyone in the industry.

31.     On July 18, 2022, Applied Digital issued a press release providing operational and guidance updates.  The press release quoted Defendant Cummins, stating, in relevant part, "[s]ince we reported our fiscal third quarter 2022 results in mid-May, our operations have continued at or better than expectations, driving our financial performance above the guidance we previously communicated[.]"

32.     On August 25, 2022, the Company issued a press release announcing its planned name change from Applied Blockchain to Applied Digital.  The press release quoted Defendant Cummins, stating, in relevant part, "Applied Digital reinforces the broader market opportunities for our next-generation digital infrastructure," and "[w]hile we remain committed to providing

10

best-in-class infrastructure solutions to our cryptocurrency mining customers, we are continuing to evaluate and explore opportunities with potential customers that offer expanded use cases for our next-generation datacenters."

33.     That same day, Applied Digital issued a press release announcing the Company's fiscal Q4 and full year 2022 financial results.  The press release quoted Defendant Cummins, stating, in relevant part, "[w]e continue to execute our growth strategy despite a volatile cryptocurrency environment," and [. . .] "[w]e also continue to see robust demand for our services, which, coupled with our strong balance sheet, ramping cash flow capabilities, and expanding nondilutive financing options, collectively provide us with an attractive go-forward outlook for our shareholders."

34.     Also on August 25, 2022, Applied Digital hosted an earnings call with investors and analysts to discuss the Company's Q4 2022 results (the "Q4 2022 Earnings Call").  During ths scripted portion of the Q4 2022 Earnings Call, Defendant Cummins stated, in relevant part:

> I want to close our prepared remarks by providing an update on the robust demand we continue to see for our services despite the headlines around cryptocurrency volatility.  Consistent with our original thesis about our business access to reasonably priced power and related infrastructure continues to be the number one bottleneck and growing cash rate for the majority of Bitcoin mining operators. Accordingly, we continue to have robust interest from miners in partnering with Applied Blockchain, putting us in an enviable position of growth where we can build datacenters with the revenue essentially contracted out before we even break ground. We're also continuing to have active discussions with a number of potential non-cryptocurrency customers. As we discussed in our last call, we expect to host hardware for other applications potentially including image processing, graphics rendering, artificial intelligence, machine learning or other blockchain networks in the future.

35.     On August 29, 2022, Applied Digital filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended May 31, 2022 (the "2022 10-K").  The 2022 10-K contained substantively similar descriptions of the Company's

hosting operation, competitive strengths, growth strategies, and Board composition and committees as discussed, *supra*, in ¶¶ 25-28.

36.     Appended to the 2022 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants, attesting that "[t]he information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operation of the Company."

37.     On October 11, 2022, Applied Digital issued a press release announcing the Company's fiscal Q1 2023 financial results and providing an operational update.  The press release stated, in relevant part:

> "Our fiscal 2023 year began with a solid start as revenue and adjusted EBITDA compared favorably to our guidance and we continued to operate and progress our three datacenter sites with a keen focus on building to nearly 500MW of hosting capacity by early calendar 2023, all of which is already contracted," said [Defendant] Cummins. "We believe that, once operational, this should translate to $100 million of annualized adjusted EBITDA, an impressive accomplishment for a company of our current size.["]

38.     That same day, Applied Digital hosted an earnings call with investors and analysts to discuss the Company's Q1 2023 results (the "Q1 2023 Earnings Call").  During the scripted portion of the Q1 2023 Earnings Call, Defendant Cummins stated, in relevant part:

> Our financial performance relative to our guidance reflects our steady execution and the consistency and predictability of our hosting only business model, which provides shareholders with revenue that is contracted out on a multiyear basis. We expect these dynamics to drive long-term high margin sustainable cash flow generation for our company.
>
> ***
>
> The next key objective for the company relates to our recent proposed name change to Applied Digital, which shareholders will vote on at our Annual General Meeting on November 10 of this year. Our name change will more accurately reflect our services and broader business offerings that serve customers that require large computing power applications. While these large computing power applications can include Bitcoin miners which compromise our current customer base, we see a

much larger market opportunity pertaining to high performance computing applications relating to image processing, graphics rendering, artificial intelligence and machine learning.

While we continue to see robust demand from Bitcoin miners, we believe there is value in diversifying our revenue base to adjacent industries that can still leverage our expertise and capabilities in building and operating next generation data centers.

39.     On November 17, 2022, the Company issued a press release announcing that it had officially changed its name to Applied Digital.  The press release quoted Defendant Cummins, stating, in relevant part, "Applied Digital is a stronger and more accurate representation of our focus and the variety of key applications for hosting the next wave of high-performance computing solutions," and "[w]e will continue to provide solutions to our cryptocurrency mining customers, while also diversifying our customer base into more high-performance computing use cases for our next-generation datacenters."

40.     On January 9, 2023, Applied Digital issued a press release announcing the Company's fiscal Q2 2023 financial results and providing an operational update.  The press release stated, in relevant part:

"Our fiscal second quarter was characterized by growth and adaptability, as we operated our Jamestown facility at full capacity for the entirety of the quarter while simultaneously growing our non-cryptocurrency opportunity set," said [Defendant] Cummins. "Following our corporate name change, we secured our first two non-cryptocurrency customers, one of which will be hosted in a new 5MW specialized processing center.

"In parallel with our newer strategic objectives, we continued to progress our next two datacenters, Garden City and Ellendale, both of which we anticipate to begin energizing by the end of February. Once fully online, we will have nearly 500MW of hosting capacity that we expect will put us at an annualized adjusted EBITDA run rate of approximately $100 million. The fact that we are accomplishing this in one of the most challenging cryptocurrency market cycles is a testament to our differentiated business model and operational execution.["

41.     That same day, Applied Digital hosted an earnings call with investors and analysts to discuss the Company's Q2 2023 results (the "Q2 2023 Earnings Call").  During the scripted portion of the Q2 2023 Earnings Call, Defendant Cummins stated, in relevant part:

> Lastly, the other strategic focus for us is to continue building out our non-crypto use cases to demonstrate the broad capabilities of our next generation data center assets. We are eager to initiate our pilot operations that I previously discussed and are actively in discussions with additional prospective customers for other HPC applications. We see significant potential in this part of our businesses as traditional data centers are a higher cost and less efficient solution than we can provide. With our proven ability to construct and operate low cost next generation data centers, we remain confident that Applied Digital will continue to be a leader in digital infrastructure in the digital infrastructure industry and capitalize on this market opportunity that is set to hit approximately $65 billion by 2030.
>
> To close while this is a difficult time for the crypto industry, we are extremely confident that we're in a position to come out of these turbulent times stronger than ever. This is an incredibly exciting time to be part of Applied Digital as we continue to build out our facilities to accommodate the strong demand we have secured by both crypto and non-crypto customers for our services.

42.     On April 6, 2023, Applied Digital issued a press release announcing the Company's fiscal Q3 2023 financial results and providing an operational update.  The press release stated, in relevant part:

> "Demand for our services from both traditional customers and emerging HPC applications remains robust, which validates our position as a financially strong and leading digital infrastructure provider to serve various hosting need[.]"
>
> ***
>
> "Looking ahead, we remain excited about the future and in our ability to deliver long-term, high-margin, sustainable cash flow. While we continue to see robust demand from cryptocurrency miners, we aim to diversify our customer base and exposure to the growing segments of the HPC market as we believe that will provide a high return on invested capital for shareholders."

43.     On May 15, 2023, Applied Digital issued a press release entitled "Applied Digital Launches Cloud Service to Empower Artificial Intelligence Applications."  The press release stated, in relevant part:

Applied Digital [. . .] today announced the launch of its Artificial Intelligence (AI) Cloud services that will provide high-performance computing power for AI applications, including large language model training, graphics rendering, and more. The AI Cloud services will be offered through Sai Computing, a wholly-owned subsidiary of Applied Digital, and will serve as the brand through which the services will be marketed.

\*\*\*

"Applied Digital's differentiated datacenter infrastructure uniquely positions us to meet the sophisticated and demanding workloads required for businesses to leverage AI and other HPC applications," [Defendant] Cummins added. "With the launch of our AI cloud service, we are able to expand our offerings and further capitalize on the unprecedented demand we are seeing from customers for our services. Applied Digital aims to be at the forefront of providing the next generation of needed services that enable and deliver on the untapped future of AI."

44.     On May 24, 2023, Applied Digital filed a Current Report on Form 8-K with the

SEC which stated, in relevant part:

> On May 23, 2023, SAI Computing LLC (the "Borrower"), a wholly-owned subsidiary of [Applied Digital], entered into a Loan and Security Agreement with B. Riley Commercial Capital, LLC and B. Riley Securities, Inc. (the "Lenders"), B. Riley Commercial Capital, LLC, as Collateral Agent, and the Company as Guarantor (the "Loan and Security Agreement"). The Loan and Security Agreement provides for a term loan (the "Loan") in the principal amount of $50,000,000 with a maturity date of May 23, 2025. At the closing on May 23, 2023, the Lenders advanced to the Borrower $36,500,000, with the remaining $13,500,000 to be advanced at the sole discretion of the Lenders.
>
> The Loan and Security Agreement provides for an interest rate of 9.00% per annum. The proceeds of the Loan **will be used to provide additional liquidity to fund the buildout of the Company's recently announced AI cloud platform and datacenters by the Borrower, and for general corporate purposes and working capital**. The Loan and Security Agreement contains events of default and covenants customary for such an agreement.

(Emphasis added.)

45.     The statements referenced in ¶¶ 24-44 were materially false and misleading because

Defendants made false and/or misleading statements, as well as failed to disclose material adverse

facts about the Company's business, operations, and compliance policies.   Specifically,

Defendants made false and/or misleading statements and/or failed to disclose that: (i) Applied Digital had overstated the profitability of its datacenter hosting business and its ability to successfully transition into a low-cost AI Cloud services provider; (ii) Applied Digital's Board of Directors was not independent within the meaning of NASDAQ listing rules; (iii) accordingly, Applied Digital overstated the efficacy of its business model and failed to maintain proper corporate governance standards; (iv) the foregoing, once revealed, was likely to subject the Company to significant financial and/or reputational harm; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

46.    On June 23, 2023, Applied Digital filed a current report on Form 8-K with the SEC, which stated, in relevant part:

> On June 23, 2023, the Company announced that its Audit Committee has conducted an internal investigation into a threat, but not a formal assertion, of a sexual harassment claim by Regina Ingel, its Chief Marketing Officer, based on a personal relationship between Ms. Ingel and Wes Cummins, the Company's Chief Executive Officer. Based on information obtained through the investigation, the Audit Committee determined that the relationship between the parties was consensual and the allegations of workplace harassment are unfounded. The Board has reaffirmed Mr. Cummins' role as Chief Executive Officer of the Company and will consider any additional actions that may be appropriate with respect to this matter.

47.    On this news, Applied Digital's stock price fell $1.58 per share, or 16.34%, to close at $8.09 per share on June 23, 2023.

48.    On July 6, 2023, market analysts Wolfpack Research and The Bear Cave published short reports on Applied Digital.  Specifically, the Wolfpack Research report, entitled "APLD: An Embarrassing and Predictable Stock Promotion," stated, in relevant part:

> Applied Digital [. . .], a potato farm turned failed bitcoin miner, pumped up its stock in May by claiming to pivot from a floundering business hosting bitcoin miners, to becoming a low-cost AI Cloud service provider. The explosion of interest in AI after the emergence of Chat GPT has predictably attracted the worst promoters and

scumbags to peddle fake AI wares to credulous investors, and our analysis indicates that APLD is one of these grifters because it is not an AI company[.]

One clue that this is a stock promotion is the heavy involvement of our favorite bottom feeding investment bank, B. Riley, whose insiders (including Wes Cummins who simultaneously serves as the President of B. Riley Asset Management and the CEO of APLD) own 48.4% of APLD. These B. Riley insiders, coincidentally registered 95% of their shares for sale the same day APLD's stock rose 320% due to a press release announcing that a mystery customer had signed a deal potentially worth up to $180 million. We expect the B. Riley insiders to exit their position with perfect timing, potentially en masse before as it becomes evident that the claims of APLD, which has failed at nearly every business it has tried, make no sense:

- Our research indicates that APLD's biggest prospective AI customer is Stability AI, who we think is one of the most dubious AI start-ups in a field awash with speculative promotions. An in-depth article by Forbes insinuated that the founder of Stability AI is a liar who exaggerated his academic credentials and mislead investors. Stability AI is reportedly burning through cash and is losing executives. These two companies make quite the pair, as we think Stability AI is pretending it can continue to afford an AI Cloud service, and we believe APLD is pretending it has one.

- APLD's CEO boldly announced in April that the company was ordering over 7,000 A100 GPUs (last year's model) for its AI Cloud service. By June APLD claimed to have ordered 26,000 GPUs, except the CEO went on twitter and bragged to his 154 followers that these were going be the top-tier H100 GPUs, which are selling for $40,000 apiece. Our research indicates that a purchase this size would allow them to jump to the top of the pile in high performance computing, alongside Google, Meta and AWS. We estimate the total price tag to purchase the equipment would be over $1 billion more than APLD's market cap.

- APLD has just eight subdomains. We spoke with an expert who said, "there is no [expletive] way you can run a digital cloud platform on eight subdomains." Technology companies, especially cloud providers, typically use many subdomains to help direct web-traffic, manage security, and provide redundancies. A private datacenter in Saskatchewan called Blacksun, that has 20 employees and is much smaller than APLD, has 235 subdomains. CoreWeave is a data center cloud provider that, like APLD, has three datacenters in the U.S. has nearly 2,000 subdomains.

- APLD's subsidiary, Sai Computing, which is the entity that supposedly struck deals with two AI customers, only has one subdomain. Even more embarrassingly, its website only has two pages, and can only capture emails.

- PLD's current power capacity is contracted out to bitcoin miners, so it does not even have the physical infrastructure to host 26,000 GPUs. APLD's assertion that it has 200MW of high-power computing space in the pipeline is extremely misleading considering that APLD has not even named a site to start building.

- ***The board is highly conflicted and, in our opinion, incompetent. Bryant Riley owns over 2 million shares of APLD, and his underlings include Wes Cummins the CEO; Chuck Hastings, an "independent" director who also serves as the CEO of B. Riley Wealth Management; and Andy Moore, the CEO of B. Riley Securities, whose wife, Virginia Moore, also serves on the board as an "independent" director.***

- B. Riley's transparently self-serving rating on APLD is a BUY with an $18 price target, which would increase the wealth of the B. Riley insiders holding the stock by ~$400 million. Yet the insiders have filed a shelf registration to sell 95% of their shares, and Bryant Riley's underlings on APLD's board have launched a $125 million at the market equity offering (ATM), in part to repay the company's $36.5 million loan from B. Riley.

- The fact that the board has essentially remained unchanged, despite the fact that APLD has switched its business model every few months since it remerged in 2021, indicates that the board lacks competence. One of the board members seems to have no pertinent experience in datacenters or bitcoin mining whatsoever, having primarily spent her time dedicated to early childhood education.

***The board's incompetence was only highlighted when the CEO was caught in an embarrassing sex scandal, where the board appears to not have hired outside counsel to investigate, but used its Audit Committee instead.*** APLD's Audit Committee, which is comprised of two old white men and one of the CEO's fellow executives at B. Riley, decided the accusations were "unfounded" because the relationship with a balloon-display entrepreneur turned CMO had been "consensual."

(Emphases added.)

49.     Further, the Bear Cave report, entitled "Problems at Applied Digital (APLD)," stated, in relevant part:

> Applied Digital [. . .] claims to "design, develop and operate next-generation datacenters across North America to provide digital infrastructure solutions to the rapidly growing high performance computing industry." The Bear Cave believes Applied Digital relies on puffery over substance and is a perfect case study on our market's bizarre underbelly of reverse mergers, microcaps, and shell companies.

Applied Digital was incorporated in Nevada in 2001 under the name Reel Staff "to provide staffing services to film, video, and television production companies." In 2002, it did a stock merger with Flight Safety Technologies and pivoted to air travel safety technology. In 2008, it pivoted to plasma technologies and later changed its name to "Applied Science Products." In 2009, the company pivoted again and acquired Cummins Family Produce, a potato processing and packaging business. Operations wound down in 2014.

Then, in December 2020, the company "filed a Certificate of Reinstatement/Revival with the Secretary of State of the State of Nevada" and in April 2021 the company changed its name to "Applied Blockchain" after acquiring crypto mining assets. In March 2022, the company told the SEC it "ceased all crypto mining operations" and in November 2022 the company renamed itself "Applied Digital" to focus on "next-generation datacenters."

50.     Following publication of the Wolfpack Research and Bear Cave short reports, Applied Digital's stock price fell $1.27 per share, or 14.16%, to close at $7.70 per share on July 6, 2023.

51.     Finally, on July 26, 2023, The Friendly Bear published a short report entitled "B. Riley May Face Fallout from Applied Digital Governance Problems."  The Friendly Bear report stated, in relevant part:

- Recent developments suggest that B. Riley is controlling managerial decisions at Applied Digital to the detriment of Applied Digital shareholders

- After raising "low-cost" debt from B. Riley specifically for the purpose of "accelerating growth", Applied Digital turned around and paid the loan off almost two years ahead of contractual maturity, and at the exact time that B. Riley needed to raise cash for its FRG acquisition

- We do not believe that Applied Digital's board meets the independence requirements under Nasdaq rules and believe the Board is essentially controlled by B. Riley

- The CEO of APLD bought shares of APLD utilizing his B. Riley fund immediately in front of significant market moving news – we believe the Boards of both companies should probe these trades

- Given the clear conflicts of interest at play, the Audit Committee's alleged investigation into the CEO's sexual harassment could subject Applied Digital to significant legal blowback

Applied Digital represents one of the worst governance situations we have ever seen and we expect both APLD and RILY could face substantial litigation in the coming months due to severe disclosure and governance problems.  We question the judgment of partners that have decided to work with Applied Digital despite its internal control [] and governance problems.

52.     Following publication of the Friendly Bear report, Applied Digital's stock price fell $0.60 per share, or 6%, over the following two trading sessions, to close at $9.40 per share on July 28, 2023.

53.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

54.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Applied Digital securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

55.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Applied Digital securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Applied Digital or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

56.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

57.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Applied Digital;

- whether the Individual Defendants caused Applied Digital to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Applied Digital securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

59.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

60.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Applied Digital securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Applied Digital securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

61.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

62.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

63.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

64.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

65.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Applied Digital securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Applied Digital securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

66.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Applied Digital securities.  Such reports, filings, releases and statements

were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Applied Digital's finances and business prospects.

67.    By virtue of their positions at Applied Digital, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

68.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Applied Digital, the Individual Defendants had knowledge of the details of Applied Digital's internal affairs.

69.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Applied Digital.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Applied Digital's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Applied Digital securities was artificially inflated throughout the

Class Period.  In ignorance of the adverse facts concerning Applied Digital's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Applied Digital securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

70.     During the Class Period, Applied Digital securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Applied Digital securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Applied Digital securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of Applied Digital securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

71.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

73.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

74.     During the Class Period, the Individual Defendants participated in the operation and management of Applied Digital, and conducted and participated, directly and indirectly, in the conduct of Applied Digital's business affairs.  Because of their senior positions, they knew the adverse non-public information about Applied Digital's misstatement of income and expenses and false financial statements.

75.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Applied Digital's financial condition and results of operations, and to correct promptly any public statements issued by Applied Digital which had become materially false or misleading.

76.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Applied Digital disseminated in the marketplace during the Class Period concerning Applied Digital's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Applied Digital to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Applied Digital within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of Applied Digital securities.

77.     Each of the Individual Defendants, therefore, acted as a controlling person of Applied Digital.  By reason of their senior management positions and/or being directors of Applied Digital, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Applied Digital to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Applied Digital and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

78.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Applied Digital.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  August 11, 2023

Respectfully submitted,

*/s/ Willie C. Briscoe*
Willie C. Briscoe
State Bar Number 24001788
**THE BRISCOE LAW FIRM, PLLC**
12700 Park Central Drive, Suite 520
Dallas, TX 75251
Telephone: 972-521-6868
Facsimile: 346-214-7463
wbriscoe@thebriscoelawfirm.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*