**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| IN RE APPLIED DIGITAL CORPORATION SECURITIES LITIGATION | **Case No. 3:23-cv-01805-E** <br><br> **AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## **TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................... 9

PARTIES ............................................................................................................................ 10

CONFIDENTIAL WITNESSES ....................................................................................... 11

SUBSTANTIVE ALLEGATIONS .................................................................................... 12

BACKGROUND ............................................................................................................... 12

    Applied Digital's Serial Identity Shifts and Checkered History............................... 13

    The Company Rises from the Ashes to Capitalize on the Crypto Mining Craze ..... 16

    Defendants Mislead Investors Regarding the Company's Pivot to HPC and Cloud
    Services ........................................................................................................................ 22

    The B. Riley Conflict and Applied Digital Board's Lack of Independence ............. 35

    Insider Transactions .................................................................................................... 44

MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE
CLASS PERIOD ............................................................................................................... 45

THE TRUTH BEGINS TO EMERGE WHILE DEFENDANTS CONTINUE TO
MISLEAD INVESTORS .................................................................................................. 64

THE TRUTH IS REVEALED ........................................................................................... 76

ADDITIONAL SCIENTER ALLEGATIONS .................................................................. 77

PLAINTIFF'S CLASS ACTION ALLEGATIONS .......................................................... 80

NO SAFE HARBOR ......................................................................................................... 83

LOSS CAUSATION AND ECONOMIC LOSS ............................................................... 83

COUNT I ........................................................................................................................... 87

    (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
    Against All Defendants) ............................................................................................. 87

COUNT II .......................................................................................................................... 90

    (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)........... 90

PRAYER FOR RELIEF .................................................................................................... 91

DEMAND FOR TRIAL BY JURY ................................................................................... 91

Lead Plaintiff Mark Manion ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Applied Digital Corporation ("Applied Digital" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Applied Digital securities between April 13, 2022 and April 11, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Applied Digital, which has undergone numerous reinventions since it commenced operations in 2001, is a stock promoter led by a conflicted and self-interested Board of Directors, that purports to operate as an artificial intelligence ("AI") cloud services provider and host of high-performance computing ("HPC") applications, though, in reality it has never had the experience, infrastructure, funds, or capacity to operate as either.

1

3.      In April 2022, after many years of dormancy following its failures to succeed as either a staffing service company, air travel safety technology company, medical device company, or potato company, Applied Digital (under the name Applied Blockchain at the time) conducted its initial public offering ("IPO"), issuing 8 million shares of common stock priced at $5.00 per share for a total of approximately $40 million in proceeds.  The primary underwriter of the IPO was B. Riley Securities, Inc. ("B. Riley Securities"), an investment bank and subsidiary of the diversified financial services platform B. Riley Financial, Inc. ("B. Riley Financial").[1]  On April 13, 2022, pursuant to the offering documents issued in connection with the IPO (the "Offering Documents"), Applied Digital's securities began trading on the Nasdaq Global Select Market ("NASDAQ").

4.      Since its IPO, and to date, the Company has earned most of its revenue from hosting miners of cryptocurrency assets (defined below) in its datacenter facilities in Jamestown, North Dakota, Garden City, Texas (recently sold), and Ellendale, North Dakota.  Throughout the Class Period, Defendants stated that they built and operated "next-generation" datacenters that were capable not only of hosting crypto miners, but also for other purposes such as AI, machine learning, and other HPC applications.  However, Defendants had not in fact built next generation data centers; they had constructed their three datacenter facilities using the same "repeatable power strategy" which involved utilizing subpar components, including transformers, which resulted in facilities that were shoddily constructed, unsafe, and at risk of power outages that could detrimentally impact operations and revenue.  Not only did Defendants lack the infrastructure and funds (as evidenced by their constant dilutive equity raises) they needed to run a cloud services

---

[1] B. Riley Financial and its subsidiaries B. Riley Securities, B. Riley Asset Management, B. Riley Capital Management, LLC, B. Riley Wealth Management, Inc., and B. Riley Commercial Capital, LLC are sometimes referred to herein collectively as "B. Riley".

business or to host other HPC applications, they also did not have the capacity.  Every megawatt

("MW") of power available at Applied Digital's existing three datacenters had already been fully

accounted for by the Company's crypto mining customers.  Regardless, Defendants could not (and

did not ever attempt to) retrofit their existing datacenters to enable these other applications.  In

other words, though promoting its stock with buzzwords like "artificial intelligence" and "high

performance computing," the Company still remained nothing more than the crypto mining

operation it was when it conducted its IPO as Applied Blockchain.

5.      Nevertheless, on May 15, 2023, Applied Digital announced that it was officially

launching cloud service to "[e]mpower [a]rtificial [i]ntelligence [a]pplications," and the following

day announced that, through its wholly owned subsidiary Sai Computing, it had signed its first AI

cloud services customer worth potentially $180 million in revenue beginning in June 2023 and

continuing over the next 24 months.

6.      Eight days later, on May 23, 2023, Applied Digital entered into a loan and security

agreement with B. Riley Commercial Capital, LLC and B. Riley Securities, pursuant to which B.

Riley lent Applied Digital $36.5 million in a "low cost" "nondilutive" "long term party loan," that

had a maturity date of May 23, 2025. The loan cost Applied Digital $1.5 million in fees.  Applied

Digital claimed that it entered into the loan agreement to supply "additional liquidity to fund the

buildout of the Company's recently announced AI cloud platform and datacenters by the

Company."

7.      One month later, on June 23, 2023, the Company announced that it had signed its

second AI cloud services customer, worth potentially $460 million over the subsequent 36 months

but did not reveal (and has never directly revealed) the identity of the customer.  However, as set

forth below, the logical deduction from a clue provided by a tweet from Defendant Wes Cummins

and a subsequent research note by Craig Hallum is that the customer is Stability AI, a company led by a dubious character that is itself struggling with massive cash burn and slowly generating revenue.

8.      With investors in the dark as to Applied Digital's lack of infrastructure and capability to actually operate as an AI cloud service provider, the seemingly promising announcements touting hundreds of millions of dollars in potential revenue from two AI cloud services customers sent Applied Digital's stock soaring from its closing price of $3.41 on May 15, 2023 to a high of $11.62 on June 23, 2023, an over 240% leap.

9.      Three days after announcing its second AI cloud services customer, the Company announced a dilutive $125 million at the market offering, which it used in part to repay the $36.5 low-cost long-term loan it had just obtained in May.  To exit the loan, Applied Digital had to pay an additional $1 million in fees to B. Riley, for a total of $2.5 million in fees on a $36.5 million loan it held for a month and a half.   Defendants provided no justification for the unfavorable whiplash repayment of the loan nearly two years ahead of its contractual maturity.  While the timing made no logical business sense for Applied Digital, it clearly benefited B. Riley which was raising money at that time for its $250 million acquisition of the holding company Franchise Group, Inc. ("FRG").

10.     It is no surprise that the Company sacrificed its best interests in favor of B. Riley. At all relevant times, B. Riley has wielded undue influence over Applied Digital and its Board of Directors.  While the Company has claimed throughout the Class Period that its Board composition complies with relevant rules regarding Board independence, nothing could be further from the truth.  As a company publicly traded on the NASDAQ, Applied Digital is required to comply with Listing Rule 5605(b)(2), which states that a majority of the Company's board of directors (the

4

"Board") must be comprised of independent directors.  Nasdaq Listing Rule 5606(a)(2) defines an independent director as "a person other than an Executive Officer or employee of the Company or any other individual having a relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director."

11.     Yet Applied Digital's seven person Board was populated with a majority of directors holding dual loyalties to both B. Riley and Applied Digital: 1) Chairman, Defendant Wes Cummins is also President of B. Riley Asset Management; 2) "independent" Director Chuck Hastings is CEO of B. Riley Wealth Management; 3) "independent" Director Virginia Moore is married to CEO of B. Riley Securities, Andy Moore; 4) "independent" Director Douglas Miller and Defendant Cummins sat together on the Board of Directors of Telenav, Inc. where they also served together on a special committee charged with reviewing sales solicitations for Telenav, for which B. Riley served as financial advisor; and 5) "independent" Director Richard Nottenburg has sat on the board of Sequans Communications with Defendant Cummins since 2018, a company in which B. Riley owns an 18.5% stake as its largest shareholder.  While Defendants divulged that ties exist between B. Riley and Defendant Cummins, Mr. Hastings, and Ms. Moore, the Company's IPO Prospectus and Forms 10-K nonetheless assured investors that Applied Digital had "structured [its] Board composition and corporate governance in order to meet the requirements of the [NASDAQ]," claimed that Mr. Hastings and Ms. Moore qualified as "independent," and characterized any conflicts of interest as purely hypothetical.  Ironically, Mr. Hastings and Ms. Moore also sat as two of the "independent" directors on the Company's Nominating and Governance Committee, which is responsible for, among other things, *assessing Board members' independence.* Defendants never revealed the connections between B. Riley and

"lead independent" director Mr. Miller or "independent" director Mr. Nottenburg.  In addition to the fact that B. Riley and Applied Digital share high level employees, the two companies also share office space and use the same shady auditor which the SEC recently charged for violating audit standards in half of its audits over a three-year period.  Moreover, collectively, B. Riley insiders owned nearly half of Applied Digital's shares during the Class Period, and Defendant Cummins even made purchases of Applied Digital stock *in his role as President of B. Riley Management*, in April and May 2023, *right before the Company announced $640 million in potential revenue from its first two AI cloud services customers*.

12.    The "conflicted" Board allowed the Company to portray itself unrestrained as capable of operating as an AI cloud services provider and host of HPC applications, though it did not have the capability to operate as either, and also enabled the Company to engage in related party transactions that inured to B. Riley's benefit at Applied Digital investors' expense.

13.    In July 2023, market analysts began scrutinizing Applied Digital's business model as well as assembling the various connections between Applied Digital and B. Riley into a cogent picture.  First, on July 6, 2023, market analysts Wolfpack Research and The Bear Cave published scathing short reports on Applied Digital (the "Wolfpack Report" and "Bear Cave Report," authored by Dan Davis and Edwin Dorsey respectively, which contained analyses not previously done any other market participant. The Wolfpack Report raised questions about the viability of the Company's business model, stating, for example, that the Company "pumped up its stock in May by claiming to pivot from a floundering business hosting bitcoin miners, to becoming a low-cost AI Cloud service provider," and "[t]he explosion of interest in AI after the emergence of Chat GPT has predictably attracted the worst promoters []to peddle fake AI wares to credulous investors, and our analysis indicates that APLD is one of these grifters because it is not an AI company[.]"  The

Bear Cave Report, detailed Applied Digital's problematic corporate history, alleging that "Applied Digital relies on puffery over substance and is a perfect case study on our market's bizarre underbelly of reverse mergers, microcaps, and shell companies."  Both reports also analyzed the blurred lines between B. Riley and Applied Digital, revealing the shocking lack of independence and resulting conflicts possessed by a majority of the Company's Board members.

14.     Following publication of the Wolfpack and Bear Cave Reports, Applied Digital's stock price fell $1.27 per share, or 14.16%, to close at $7.70 per share on July 6, 2023.

15.     Then, on July 26, 2023, The Friendly Bear published a short report on Applied Digital, authored by Nathan Koppikar ("The Friendly Bear Report").  The Friendly Bear Report conducted an analysis that led it to conclude that B. Riley "is controlling managerial decisions at Applied Digital to the detriment of Applied Digital shareholders;" that Applied Digital's board does not "meet[] the independence requirements under Nasdaq rules and . . . is essentially controlled by B. Riley."  The Friendly Bear Report also alleged that clear conflicts of interest undermined the Company's purported investigation into sexual harassment claims made against Defendant Cummins the previous month, noting that the manner in which the claims were summarily dismissed by Applied Digital's Audit Committee could subject Applied Digital to "significant legal blowback."

16.     Following publication of the Friendly Bear Report, Applied Digital's stock price fell $0.60 per share, or 6%, over the following two trading sessions, to close at $9.40 per share on July 28, 2023.

17.     However, even following publication of the censorious short seller reports, Defendants continued to mislead Applied Digital investors regarding the true nature of its business

7

operations, the capabilities of its datacenter facilities in Ellendale and Garden City, and the risk of power outages.

18.     Specifically, Defendants continued to tout its operational datacenters as "next generation," touted the hundreds of millions it would earn from the two AI cloud services customers it had signed, continued to promise that its Garden City datacenter could achieve a 200MW capacity, and described the risk of power outages at its datacenters as purely hypothetical.

19.     However, in reality the Company's datacenters were not "next generation" and could only accommodate the Company's crypto mining customers because Defendants had shoddily constructed the datacenters using subpar components including transformers, thus raising the risk of power outages that could materially impact the Company's revenue, and did not have the experience, infrastructure, funds, or capacity to operate as an AI cloud service provider or to provide next generation datacenter hosting for other HPC applications.  Moreover, Defendants never revealed that the Company's Garden City datacenter could never achieve a 200MW capacity and that the Company in fact would have to imminently sell the Garden City datacenter for a massive loss due to ballooning operating losses and negative gross profit.

20.     On February 9, 2024, Applied Digital disclosed in a Form 8-K that it experienced a power outage at its Ellendale datacenter hosting facility beginning on January 18, 2024.  As of February 6, 2024, Applied Digital determined that revenues from the facility will be materially impacted for the quarter ending February 29, 2024.  The Company did not reveal what caused the outage.

21.     However, the disclosure revealed a materialization of the risk that the Ellendale facility, on which the Company relied for a material percentage of its overall revenue, would

8

experience an outage that would detrimentally impact the Company's revenues due to the subpar components, including transformers, with which it had equipped its datacenter hosting facilities.

22.     On this news, Applied Digital's stock price fell 8% to close at $4.85 the following trading day, on February 12, 2024.

23.     Finally, on April 11, 2024, the Company reported its financial results for the fiscal third quarter ended February 29, 2024, which revealed for the first time that though the Company had previously touted its Garden City facility as capable of achieving a 200MW capacity and had just stated on January 16, 2024 that it expected dramatic improvement in cash flow from all of its crypto mining datacenters following May 1, 2024, it had nevertheless been forced to sell the Garden City facility *for a $21.7 million loss*, in an apparent desperate move to buoy its distressed balance sheet.  The Company also revealed that its Ellendale facility was operating at just 14% capacity following the power outage in February, which it finally revealed "were due to transformers not meeting industry standards."

24.     On this news, Applied Digital's stock price fell 11.7% to close at $2.71 the following trading day, on April 12, 2024 on unusually heavy volume.

25.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

26.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

28.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Applied Digital is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

29.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

30.     Plaintiff, as set forth in the attached Certification, acquired Applied Digital securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

31.     Defendant Applied Digital is a Nevada corporation with principal executive offices located at 3811 Turtle Creek, Blvd, Suite 2100, Dallas, Texas 75219.  Applied Digital's common stock trades in an efficient market on the NASDAQ under the ticker symbol "APLD".

32.     Defendant Wes Cummins ("Cummins") has served as Applied Digital's CEO at all relevant times.

33.     Defendant David Rench ("Rench") has served as Applied Digital's Chief Financial Officer at all relevant times.

34.     Defendants Cummins and Rench are sometimes referred to herein as the "Individual Defendants."

35.     The Individual Defendants possessed the power and authority to control the contents of Applied Digital's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Applied Digital's SEC filings and press

10

releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Applied Digital, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

36.     Applied Digital and the Individual Defendants are collectively referred to herein as "Defendants."

## CONFIDENTIAL WITNESSES

37.     Confidential Witness ("CW") 1 worked in Business Development at Applied Digital (then Applied Blockchain) from September to December 2021 and reported to Chief Marketing Officer Regina Ingel.

38.     CW2 worked on the IT team at Applied Digital from March to November 2022 and in that role helped build Applied Digital's compute networks in Jamestown, North Dakota.

39.     CW3 worked as the lead Datacenter Systems Engineer from July 2022 to March 2024, reported to Mike Maniscalco (then Executive Vice President of Technology), and attended meetings with Defendants Cummins and Rench.

40.     CW4 worked as a financial analyst intern from May 2022 to January 2023.  In that role, CW4 had the task of tracking Applied Digital's competitors, including what they paid for energy and megawatts.  CW4 reported indirectly to CFO Defendant Rench.

11

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

41.     Applied Digital currently describes itself on its website as, "a U.S.-based operator of next-generation digital infrastructure, providing solutions to the fields of High-Performance Computing (HPC) and Artificial Intelligence (AI)." Per its latest Form 10-Q filed for the three months ending February 29, 2024 ("Q3 2024 10-Q"), the Company purports to have <u>three</u> reportable segments:

- Hosting crypto miners: "the Datacenter hosting segment operates datacenters to provide energized space to crypto mining customers. Customer-owned hardware is installed in the Company's facilities and the Company provides operational and maintenance services for a fixed fee."

- Cloud Services: "the Cloud services segment operates through our Sai Computing brand and provides cloud services to customers, such as artificial intelligence and machine learning developers, to develop their advanced products. Customers pay a fixed rate to the Company in exchange for a managed hosting environment supported by Company-provided equipment."

- HPC: "the HPC hosting segment designs, builds, and operates datacenters which are designed to support high-compute applications using advanced and sophisticated infrastructures to provide services to customers."

42.     While it doesn't describe itself as predominantly a crypto mining host, Applied Digital in fact still earns over 90% its revenue from hosting crypto miners in its two datacenters located in Jamestown and Ellendale, North Dakota. The Company recently sold a third datacenter used for hosting crypto miners, located in Garden City, Texas, for a $21 million loss. During the Class Period, the Company touted its datacenters as "next-generation" but never revealed that, in fact, they had shoddily constructed the hosting facilities from subpar and cheap components, raising safety concerns and material risks of power outages that could impact revenues.

43.     As described below, during the Class Period the Company also touted its cloud services segment, launched in May 2023, as worth potentially *hundreds of millions* in revenue

between mid- 2023 and mid-2026 from only two customers (one who the Company has never identified). The Company never divulged that it lacked the experience, funds, and infrastructure to actually operate as a cloud services company and that, even if it did, at least one of its two customers did not have anywhere near the adequate funds to provide the hundreds of millions in revenue the Company had hyped. To date, the Company has reported approximately $12 million total in revenue from its cloud services segment and $41 million in losses.

44.     HPC, supposedly the Company's third business segment, is the practice of aggregating computing resources to gain performance greater than that of a single workstation, server, or computer. HPC can take the form of custom-built supercomputers or groups of individual computers called clusters. A supercomputer contains thousands of compute nodes that work together to complete one or more tasks. This is called parallel processing. It's similar to having thousands of PCs networked together, combining compute power to complete tasks faster. HPC provides users with the ability to process data and perform complex calculations at high speeds. *The HPC hosting segment has yet to earn any revenue.*

### Applied Digital's Serial Identity Shifts and Checkered History

45.     Since its inception in 2001, Applied Digital's core business has completely altered its identity multiple times—from staffing services to air travel safety technology to medical device development to potatoes. Indeed, each new iteration of the Company represented a complete often head scratching pivot from the prior iteration.

46.     Applied Digital was incorporated in Nevada in 2001 under the name Reel Staff "to provide staffing services to film, video, and television production companies."

13

47.     In 2002, the Company completed a stock merger with Flight Safety Technologies and pivoted to air travel safety technology.  Its sole business involved developing a laser-based listening device for NASA.  That contract terminated with no viable product.

48.     In 2005, Defendant Cummins invested in Flight Safety Technologies and formally joined the Board.  After the termination of the NASA contract, with Defendant Cummins' involvement, the Company pivoted in 2008 to developing a medical device for the treatment of chronic wounds using plasma technology from the University of Tennessee and later changed its name to "Applied Science Products" on October 23, 2009.

49.     According to Defendant Cummins' article, "From Potatoes to AI: The Unique Formation of Applied Digital," as appears on Applied Digital's website (https://applieddigital.com/from-potatoes-to-ai-the-unique-formation-of-applied-digital/):

> The company raised additional capital to fund the development, but capital became scarce after the Great Financial Crisis. To continue funding the development, ***I sold a potato processing plant to the company in exchange for stock which provided cash flow***. It was a bit strange to have a potato business and a medical device business in the same company, nonetheless, ***served the purpose of funding the development***. The company ended up unsuccessful with the device and I decided to close the operations and the company had been dormant since.[2]

50.     The acquisition of the "potato processing plant," called Cummins Family Produce ("CFP"), took place in 2009.  While Defendant Cummins acknowledged that it was a "bit strange" to have a potato business and medical device business under one company, the acquisition in fact provides an example of Defendant Cummins' penchant for spinning a tale to mislead investors, which, as explained below, continued into and throughout the Class Period.[3]

51.     Defendant Cummins claimed that the CFP acquisition "provided cash flow."  In reality, the business operated at a loss and was headed for insolvency within the year.  Defendant

---

[2] In all quotations herein, emphasis is added, unless otherwise noted.
[3] *See* https://guastywinds.substack.com/p/apld-follow-up-the-shady-truth-about.

Cummins and a family member traded their shares equaling a 100% stake in CFP for a 65% stake in Flight Safety Technologies. The related 13-D filing claimed that the "purpose of the transaction was to…raise working capital for [Flight Safety Technologies]." The subsequent Form 10-Q filing repeated that the "basic goal is to acquire cash flow" and stated that "we anticipate that this business can generate between $700,000 and $900,000 of free cash flow per year." The Form 10-Q further stated that Flight Safety Technologies assumed a $211,000 promissory note that Defendant Cummins personally owed to Stearns Bank. Defendant Cummins provided no business rationale for giving away his business, which he claimed could generate $700-900k in free cashflow, for a 65% equity stake in a failing development company.

52.     In actuality, CFP's financial condition was far from positive. The Form 10-Q Flight Safety Technologies filed after the acquisition showed that in the nine months ended February 28, 2009, CFP lost approximately $350,000, had approximately $1.25 million in assets against $1.6 million in liabilities ($1.5 million of which was due in the subsequent twelve-month period). Moreover, the Company did not receive any hard assets from CFP in the acquisition as they remained with a different private company called Cummins Family Holdings that Defendant Cummins also owned, and the hard assets were leased back to CFP. In the risk section of the same Form 10-Q, the Company admitted that CFP needed to raise additional working capital for fiscal fourth quarter. In other words, the company it acquired to "raise working capital" itself needed to raise capital.

53.     Additionally, the Company admitted in the Form 10-Q that because it had not done an audit of CFP prior to the acquisition, it did not know about "several significant transactions amongst its shareholders and other related parties that may not have been at arms-length" and further discovered that due to "restructuring and streamlining of operations that occurred

subsequent to May 2008," any positive historical performance "would not be indicative of the operations of the ongoing business." Indeed, 80% of CFP's payables were due to two entities controlled by Defendant Cummins and his family. The Company further admitted that "[h]ad we been able to conduct an audit of the acquired business's historical financial statements, potential adjustments to the amounts included above may have come to our attention." There is no explanation as to how this could have happened given that Defendant Cummins stood on both sides of the transaction. As described below, this was not the last time Defendant Cummins would stand on two sides of a transaction as a conflicted senior leader of two entities (Applied Digital and B. Riley).

54. After switching its name to Applied Science Products, and despite the deleterious state of CFP's finances, the Company's website continued to claim that "[CFP] generates substantial cash flow which [Applied Science Products] is able to use to partially support development of its technology driven products."

55. Ultimately, CFP had negative cash flow every year except one in which it earned approximately $72,000 (far from the estimated $700,000-900,000 the Company had touted), and the Company thus needed to raise money. It did so on multiple occasions between 2009 and 2011 with the help of related party B. Riley, thus earning Defendant Cummins (as a B. Riley President) fees on the capital raises.

56. The Company fully wound down all operations in 2014 and remained a dormant shell company for the next six years.

### The Company Rises from the Ashes to Capitalize on the Crypto Mining Craze

57. Cryptocurrencies are digital "tokens" that are circulated on networks using blockchain technology. At the heart of the technology is the blockchain, a "decentralized,

immutable ledger" that relies on participants in the network to cooperatively verify and record pending transactions. Participants do so by using their computers' processing power to solve "a difficult mathematical puzzle through laborious trial-and-error work," and solutions are rewarded with new issues of cryptocurrency. This puzzle-solving process is called "mining." In recent years, crypto networks have grown in size and complexity, making crypto mining an increasingly computational-intensive task. As a result, crypto miners use powerful mining hardware, such as GPUs, to perform their mining. The two most popular cryptocurrencies are Bitcoin and Ethereum.

58.     To capitalize on the crypto mining craze, in December 2020 the shell Company, "filed a Certificate of Reinstatement/Revival with the Secretary of State of the State of Nevada" and in April 2021 changed its name to "Applied Blockchain" after acquiring crypto mining assets from Sparkpool, an Ethereum[4] mining pool, in March 2021. After its stark pivot from medical device developer/potato farmer to defunct shell to crypto miner, Applied Blockchain purportedly focused on building and operating large datacenters in the United States for crypto miners, in the wake of China's ban on crypto mining.

59.     In describing its then-current business model in a Form S-1 Registration Statement filed on August 13, 2021 ("August 2021 S-1"), the Company explained that it was, "a participant in the dynamic Cryptoeconomy, actively mining cryptoassets and developing hosting services offered to other cryptoasset (crypto) miners." The August 2021 S-1 made clear that Applied was "***rapidly deploying capital to expand mining operations***."

60.     By October 19, 2021, only two months later, the Company entered into a services agreement with SparkPool pursuant to which SparkPool would "provide advice" to Applied to

---

[4] Ethereum is a decentralized blockchain platform that establishes a peer-to-peer network that securely executes and verifies application code, called smart contracts, which allow participants to transact with each other without a trusted central authority. Ether is the native cryptocurrency of the platform.

enable it to establish a pool services business, and in return SparkPool would receive a share of any revenue Applied received for such services, to include access to technology and resources for mining pool services.

61.     Operating a mining pool is different than "actively mining cryptoassets." Cryptocurrency mining pools are groups of miners who share computational resources to increase the chances of successfully mining for cryptocurrency. As a pool operator, Applied Digital would take a 2% fee for all crypto the pool earned. The Company still maintained at this point that it was "rapidly deploying capital to expand mining operations."

62.     Yet, only one month later, the Company pivoted yet again. As the Company explained in the Form S-1 it filed on November 22, 2021 ("November 2021 S-1"), while its initial mission was to "quickly scale a large mining operation focused on mining Bitcoin and Ethereum," it then determined that constructing its own co-hosting[5] facilities "would enable us to generate a stable cash flow stream through long-term hosting agreements, lower the cost of power for our own mining operations and eliminate risks to us of relying on a third-party host," and during that process came to the further determination that focusing the Company's resources on building co-hosting operations benefitted stockholders more than expanding mining operations. Specifically, the Company now stated that, "we have determined not to use further resources to continue to expand our cryptomining business at this time," though curiously it still listed "rapidly deploying capital to expand mining operations" as part of its "multi-pronged" growth strategy.

63.     In other words, within three months of filing its first August 2021 S-1 as Applied Blockchain, Inc., the Company went from rapidly deploying capital to expand its active mining of cryptoassets, to attempting to simultaneously operate as a mining pool services business, to

---

[5] Hosting is a service that includes a facility powering, housing, and maintaining mining equipment.

focusing on building co-hosting datacenters and ceasing any expansion of its crypto mining operation.

64.     According to CW1, while at this point in time Applied Blockchain shifted its focus entirely to providing datacenters to host crypto mining, Company leadership "had zero experience with it."  CW2 confirmed that nobody at the Company had any expertise in crypto mining. Moreover, CW1 made clear that there was no talk internally then about pivoting to or expanding beyond the world of crypto mining into AI cloud services or HPC.

65.     In the November 2021 S-1, the Company also disclosed plans to construct its first co-hosting facility which it had begun building on property it purchased in Jamestown, North Dakota and expected to complete in the fourth quarter of calendar year 2021, and further disclosed an agreement to power the facility with 100 megawatts ("MW").  The Company reported that it had four customer agreements already in place for use of the full 100MW in the Jamestown datacenter and for use of 85MW in a second facility yet to be in development.

66.     In a Form S-1/A filed on December 14, 2021, the Company no longer stated that it was rapidly deploying capital to expand mining operations, instead stating for the first time that "[w]e expect that we will exit our mining operations in the future."

67.     In April 2022, Applied Blockchain conducted its IPO, issuing 8 million shares of common stock priced at $5.00 per share for a total of approximately $40 million in proceeds.  B. Riley securities was the primary underwriter of the Company's IPO.

68.     That same month, on April 25, 2022, the Company broke ground on its second datacenter hosting facility in Garden City, Texas, and told investors it would have a massive 200MW capacity.

69.     On September 19, 2022, five months after its IPO, the Company issued a press release announcing that eleven days prior it broke ground on its third datacenter hosting facility, expected to have a 180MW capacity, in Ellendale, North Dakota.  The Company claimed in the press release that it was "leveraging experience the Company gained from the construction and operation of its Jamestown facility."

70.     According to CW2, the Jamestown datacenter had countless issues, including extremely unsafe work conditions.  Indeed, CW2 would receive "messages 24/7 from people on site saying they were going to get electrocuted."  CW2 stated that when the Company built the Jamestown facilities, they cut every corner, and the buildings could not even keep the elements out.  "When it would snow, the snow would come inside."

71.     CW2 explained that the Company used subpar components, including transformers, from China and had rushed things along due to the IPO.  CW2 stated that the Company could not procure better transformers when constructing its datacenters because of supply chain issues.  CW2 made clear that these inadequate transformers were unable to handle the power coming into the facilities and that there were constant outages.  Corroborating CW2's statements, CW3 confirmed that the Company constructed its datacenters with subpar components from China that they "got dirt cheap from weird vendors," stating they "cut corners all over the place" and did not even have backup generators.  According to CW3, they would also buy used hardware and "the cheapest stuff you could possibly find."

72.     CW2 also stated that the Company would have used the same components to build subsequent facilities, including Ellendale, which was located an hour and a half away from the Jamestown site.  Indeed, as stated above, the Company admitted to constructing the Garden City

20

and Ellendale facilities based on how it constructed and operated Jamestown, calling it a "repeatable power strategy" in its Form 10-K for fiscal year ended May 31, 2023 ("2023 10-K").

73.     Given that the Company repeated its "power strategy" based on the "build-out of our first North Dakota facility" when constructing the Garden City and Ellendale datacenters, as the 2023 10-K made clear, Defendants knew or were reckless in not knowing that they would face the same risks of outages in those locations.

74.     CW2 explained that datacenters are supposed to be "highly controlled facilities" that "are very clean, very secure," but at Jamestown employees were standing in water in fear of electrocution from thousands of vault transformers and massive amounts of voltage.  CW2 described an incident in May 2022 where the wind blew a piece of foam with aluminum on it into the wire feeding the power at Jamestown and it shorted the wire.  It caused a massive explosion and half the facility went dark and stayed that way for four months.

75.     CW2 knew about all the issues with the Jamestown facilities because CW2 would monitor the facilities both on site during the day and via a monitoring screen at night and would receive constant messages from those on site complaining about the conditions.

76.     CW2 alerted senior leadership that people at Jamestown are "working on electrical things that are popping and shorting out and they're standing in water."  Additionally, CW2 also sent a letter to Jason Zhang and Defendant Cummins detailing all the physical and electrical concerns at the datacenter.  Instead of remediating, the Company fired CW2.

77.     At no point in time did Defendants reveal to investors that they had constructed their three datacenter hosting facilities, from which they earned 100% of the Company's revenue hosting crypto miners at the time, using subpar components that led to unsafe working conditions

21

and outsize risks of power outages that could materially impact the Company's primary source of revenue.

78.     Additionally, Defendants misled investors regarding the power capabilities of the Garden City, Texas datacenter and its timeline for energization.   Specifically, Defendants repeatedly told investors that upon completion the Garden City facility would "provide 200 MW of power to hosting customers." In reality, according to CW3, everybody, including Defendants Cummins and Rench, knew that the facility would never achieve 200MW because "Texas did not want to give them 200MW of electricity…which is enough to power a small city." CW3 said the Garden City facility had a lot of issues with the connections, i.e. the breakers and metering, for the datacenter.  CW3 emphasized, based on communications to employees from Defendant Cummins and CW3s attendance at meetings that Defendant Cummins attended, that Defendant Cummins knew about these issues.  Indeed, despite Defendants' public representations that they were ahead of schedule on the Garden City facility and would be up and running in the second half of 2022, the Company did not energize the facility until October 20, 2023 and even then, could not energize at the 200MW capacity Defendants had promised.

**Defendants Mislead Investors Regarding the Company's Pivot to HPC and Cloud Services**

79.     Seeking to capitalize next on the popularity of AI, and the meteoric rise of ChatGPT, the Company told the market that it would pivot yet again.  To provide investors with the clear impression that it no longer intended to solely operate datacenters for cryptocurrency mining, in November 2022 the Company renamed itself "Applied Digital," stating it would now focus on "next-generation datacenters" that "provide massive computing power."   In the press release announcing the proposed change in August 2022, the Company stated, "it is important for the Company to distinguish that its next-generation datacenters support many other high-

performance compute (HPC) applications." The proxy soliciting the name change, filed September 27, 2022, summarized the Company's latest business model as follows:

> The Company designs, builds and operates next-generation datacenters that host high performance computing (HPC) applications that include, but are not limited to, cryptocurrency mining.

80.     In reality, the "next-generation datacenters" were 100% limited at that point in time to hosting cryptocurrency mining, as the Company did not have the funds, infrastructure, capacity or capability, to segue into supporting other HPC applications.  Moreover, as CW2 made clear and communicated to Defendant Cummins, the Company's datacenters were hardly next-gen, but rather "a few generations backwards" and certainly not equipped to provide massive computing power.  CW3 confirmed that the Company's supposedly "next-generation" datacenters were definitely not next generation, describing them as "dirty old datacenters without even the proper filtration."

81.     CW2 stated that the Company first began talking internally about pivoting into a HPC company in September 2022, which CW2 learned from a phone call with Mike Maniscalco. According to CW2, Maniscalco asked CW2 if they could build computer racks in a water shed to test if they could do HPC using H100 GPUs, because the Company did not have enough money to build a new HPC facility.  CW2, along with Josh Walton (a senior network architect) and Cory von Seggern (a lead network engineer) began creating diagrams though they made clear to senior leadership that they had never built an AI network before.  CW2 explained that the network the Company used for crypto mining could not be used for HPC.  Ultimately, they realized the water shed was (unsurprisingly) not a viable option for HPC.  But, as CW2 explained, the Company had maxed out its available power for crypto mining and would need to "build more power" to pivot to AI/HPC.

23

82.     CW3 also stated that Defendants Cummins and Rench "absolutely knew" that they did not have the experience or infrastructure they needed to succeed as an HPC or AI cloud services company.  According to CW3, it was a running joke at the Company that this supposedly next-generation AI company has a "crappy" Internet connection.  As CW3 stated, the Company's "infrastructure is embarrassing."  The senior network architect, Josh Walton, told CW3 that he had no experience building anything like this and "literally just Googled stuff."  As CW3 stated, when AI gained popularity, "it was literally just one day when we changed our name to Applied Digital and were told that we were going to do AI," but Defendants did not know what they were doing. CW3 confirmed the Company's penchant for trying to capitalize on the "buzzwords the market drools over," like "bitcoin, blockchain, AI," but they did not have the funds or infrastructure to back it up, would "skimp at every corner," and "did everything by the seat of their pants."

83.     During an April 6, 2023 earnings call, to convince investors that the Company had the capability to successfully pivot to HPC, though it did not, Defendant Cummins reported that the Company "broke ground on a 5-megawatt standalone facility adjacent to our Jamestown site in December, that will host several hundred graphics processing units for machine learning application with a new customer" and further stated that, "when finalized, we expect to have over 7,000 NVIDIA A100 class GPUs in the building, making it one of the largest GPU clusters of its kind in the world."  The representation was important to convincing investors that the Company would have the infrastructure and capability to operate a HPC segment because both GPUs and site capacity are essential to that endeavor.

84.     Then, on May 16, 2023, the Company for the first time announced its debut as an AI cloud service provider with the signing of its first major AI cloud computing customer. Specifically, the press release announced that the Company's "recently launched AI Cloud

24

Service, through its wholly-owned subsidiary Sai Computing, has secured its first major AI customer with an agreement worth up to $180 million over a 24-month period."

85.     Sai Computing ("Sai") is the wholly owned subsidiary that Applied Digital formed on May 15, 2023, *the day before the announcement*, for the sole purpose of renting out datacenters to AI cloud service providers.  Sai claims on its rudimentary one-page website that it provides "infrastructure purpose-built for high-performance at ultra-low cost."  According to CW3, Sai is not actually a separate company; it is Applied Digital, and all the same people, simply using a different name.

86.     The announcement, which came pre-market, described the potential for $180 million in revenue over a 24-month period from that one customer. In the press release, Defendant Cummins mentioned that this is just the "tip of the iceberg:"

> With a surge in demand for high-performance compute power to support the growing AI industry, we are excited to be at the forefront of this transformation. This partnership not only reaffirms our commitment to advancing emerging technology applications but also solidifies our position as a key player in the digital infrastructure landscape

87.     The press release said the revenue includes a significant prepayment with service beginning in June. The press release did not identify a baseline revenue estimate or an estimate of how much of the $180 million would be realized before the end of 2023.  The press release also did not reveal that the Company did not have the infrastructure in place to effectively operate as a cloud services provider and thus could not realize anywhere near $180 million in revenue.

88.     Given that Applied Digital had less than $41 million in trailing twelve-month revenue at the time, the market paid heed.  That day, the Company's shares closed 79% higher and did so on nearly eighty times the volume from the previous day.  The customer was later identified as Character.AI, a neural language model chatbot application founded by former Google

25

executives that generates humanlike text responses and can participate in "contextual" conversation.

89.    After hours that same day, the Company announced two separate prospectus filings that detailed the registration of 13,500,213 and 41,224,531 shares of the Company's common stock for sale. The two combined shareholder registrations amounted to 54,724,744 common shares. These sale registrations represented 57% of the 95,908,964 outstanding Applied Digital's common shares.  Defendant Cummins, who collectively owned approximately 42 million shares, amounting to approximately 44% of the Company's outstanding common stock, registered all but 2.1 million of his shares for sale.  Co-founder Jason Zhang registered all 3,256,426 of his shares. CFO David Rench and CMO Regina Ingel also registered the majority of their shares.  B. Riley insiders collectively registered 95% of their stock for sale.

90.    On May 17, 2023, the day after touting $180 million in expected revenue over the following 24 months, Applied Digital disclosed a highly dilutive $175 million mixed shelf offering. The Company stated that the proceeds from the offering would be used to fund working capital needs.

91.    On May 24, 2023, the Company issued a press release announcing that it had begun working with Supermicro, "a global leader in Application-Optimized Total IT Solutions, to deliver Applied Digital's AI Cloud service."  Specifically, the press release stated:

> Supermicro is a leading provider of application-optimized, high-performance server and storage solutions that address a broad range of computational-intensive workloads. Supermicro's next-generation GPU servers significantly lower the power requirements of datacenters. With the amount of power required to enable today's rapidly evolving large scale AI models, optimizing the Total Cost of Ownership (TCO) and the Total Cost to Environment (TCE) is crucial to datacenter operators.

However, according to CW3, Supermicro is a "weak" "second-tier brand."  CW3 explained that the "hardware that they run is full of bugs and it's clunky, but we got it for a good price so that's why we did it."

92.     On June 23, 2023, the Company announced before market hours that it secured a second cloud services customer in the AI industry through Sai, potentially worth $460 million over 36 months, substantially more revenue than announced for its first customer on May 16.  In the press release, Defendant Cummins referenced the growth of the AI industry at "unprecedented levels," and stated, "[t]his agreement marks another milestone in APLD's HPC/AI Infrastructure growth trajectory as we continue to strategically expand our focus on artificial intelligence cloud services in addition to our next-generation datacenter." Similar to the May 16 announcement, the Company provided limited information and did not disclose the identity of the customer.  The same day, the Company issued a press release announcing the energization of the Ellendale datacenter, but said nothing regarding the risks triggered by their use of subpar components and corner cutting when constructing the facility.

93.     The stock soared as high as $11.62 that day, up 20% from its previous close of $9.67, before closing down for the day amid reports of an internal investigation into a sexual harassment claim against Defendant Cummins.

94.     The following day, Defendant Cummins tweeted a link to a Bloomberg article, titled "These Are the 10 AI Companies to Watch Right Now" and stated that both of Applied Digital's cloud services customers appear on the list:

27



95.     Bloomberg's list of "10 AI Companies to Watch Right Now" included:

- OpenAI

- Stability AI

- Runway

- Hugging Face

- Cohere

- Anthropic

- Character.AI

- Midjourney

- Scale AI

- Abnormal Security

96.     Defendant Cummins rebuffed requests to identify the two customers in the comments to his tweet, stating:

> I would love to announce them and eventually we will. There is some sensitivity on our customer's side right now. Basically don't want to rock the boat with their current provider until our capacity is ramped.

97.     Buoyed by these two customer announcements given that the Company had only generated $55 million in revenue in fiscal 2023 and had doubled its net loss to $44.6 million, analysts began baking these two customer deals into their long-term forecasts. Indeed, the Company stated that it expected revenues to explode 595%-631% to $385 million-$405 million in fiscal 2024.  Analysts reported that, based on these two customer signages, they expected Applied Digital's revenue to soar to $852 million in fiscal 2026, representing a compound annual growth rate (CAGR) of 149% from fiscal 2023.

98.     In a Form 8-K the Company filed three days after announcing its second AI cloud services customer, and two months after announcing it would procure 7,000 GPUs, Defendants nearly quadrupled down, stating that:

> [T]o support our AI Cloud Services and contracts, we have ordered over 26,000 GPUs. Demand for our AI Cloud product is high. The pipeline of business opportunities we are exploring is large, with the top 11 opportunities having the estimated potential to provide us up to an aggregate of $1.3 billion of revenue over 3 years.

99.     The same day, on Twitter, Defendant Cummins was asked how the Company planned to execute on achieving that amount of A100 GPUs given that lead times are 6 months out, to which Cummins responded that Applied had ordered the H100s, which is the newer model. However, what Defendant Cummins did not state is that NVIDIA sells its H100 GPUs for $40,000

each, which would mean Applied Digital's 26,000 GPU order would cost $1 billion ($140 million above the Company's market capitalization at the time) or $1.3 billion ($500 million above the Company's market capitalization at the time) if Applied Digital purchased the NVIDIA cluster of 8 H100 GPUs which cost $400,000 each.  Indeed, for the fiscal third quarter of 2023, ended February 28, 2023, Applied Digital had only $22.9 million in cash, $24.4 million of total current assets, and had a trailing twelve-month free cash flow of -$73.9 million.

100.    In the Company's 2023 10-K, Defendants stated that they had received and deployed 1,024 of the 26,000 GPUs in June 2023, but further stated that it had to "subsequently finance through an arrangement totaling approximately $41 million over 24 months" to afford even those GPUs (at $40,000 apiece).

101.    According to CW3, the Company's representation that they could procure and deploy 26,000 GPUs was "totally untrue."

102.    While the Company never directly revealed the identity of the second customer other than to state in Defendant Cummins' tweet that the customer's name appeared on Bloomberg's top ten list, a Craig Hallum research note published on June 26, 2023 revealed that the customer is a "London-based AI large language model." The only "London-based AI large language model" on Bloomberg's list was Stability AI, a company led by the unscrupulous Emad Mostaque, which was quickly burning cash and slowly generating revenue.  A scathing Forbes article, dated June 4, 2023, titled "The AI Founder Taking Credit for Stable Diffusion's Success Has a History of Exaggeration," reports that Mostaque falsely claimed to hold a master's degree from Oxford, falsely claimed to be an award-winning hedge fund manager, falsely claimed to be a trusted confidant to the United Nations, and falsely claimed to be the tech founder behind Stable Diffusion, a wildly successful text-to-image generator that he also claimed forced OpenAI to

launch ChatGPT.  In reality, Mostaque only holds a bachelor's degree from Oxford, Mostaque's "hedge fund's banner year was followed by one so poor that it shut down months later," the "U.N. hasn't worked with him for years," and the source code for Stable Diffusion was "written by a different group of researchers" which Mostaque's startup Stability AI did not even know about when it was created, according to the professor who led the research team.  The Forbes article references Mostaque's lack of formal experience in AI and states that "Interviews with 13 current and former employees and more than two dozen investors, collaborators and former colleagues, as well as pitch decks and internal documents, suggest his recent success has been bolstered by exaggeration and dubious claims."  Mostaque claimed to have entered into a "strategic partnership" with Amazon at an 80% discount but a Stability spokesperson admitted that Stability "had no special deal with Amazon."  Fundraising decks claimed Stability had partnerships with OECD, WHO and World Bank but all three organizations denied these partnerships existed, according to Forbes.

103.    Indeed, Mostaque's path closely resembles that taken by Defendant Cummins. Mostaque began in finance, "went through a string of abandoned startups" (which included a crypto project), and then founded Stability in 2019 with its first iteration as an AI-powered data hub for global agencies to use to make decisions relating to COVID-19, which failed a year after inception.  According to Forbes, the "company's focus shifted several more times," until pivoting to "position Stability as one of the leading unicorn AI companies of the moment" "through a series of maneuvers and exaggerations," including that Stability was "assembling one of the world's 10 biggest supercomputers."  Mostaque claimed to have built the supercomputer with thousands of Nvidia's state of the art GPU's purchased with an 80% discount from Amazon Web Services but three former Stability employees told Forbes that the discount was no different from what Amazon

31

offered its other customers and, in fact, "Amazon had threatened to revoke [Stability's] access to some of its GPUs because it had racked up millions in bills that had gone unpaid for months." Moreover, seven current and former Stability employees described a cash crisis that led to delayed or unpaid wages and taxes, though Forbes obtained screenshots showing that at the same time, Mostaque's wife, then Head of PR at Stability, transferred tens of thousands of British pounds to her personal account.  Mostaque issued a blog post to counter the allegations of the Forbes article. The blog post did not refute all of the allegations, offering flimsy justifications instead.

104.     Later the same month, Bloomberg reported that two high level senior executives at Stability AI—the Head of AI Research and the Chief Operating Officer left the company and further reported that Stability AI struggled to raise funds at its purported $4 billion valuation, only managing to raise $25 million with a convertible note that Spring.

105.     A few months prior to the Forbes article, Semafor published an article dated April 7, 2023, titled "Stability AI is on shaky ground as it burns through cash and looks at a management overhaul," and similarly described Mostaque's lack of relevant experience and exaggerated claims. Semafor reported that Stability AI burnt through most of the $100 million it had raised the prior year and could not generate sufficient revenue to offset its mammoth costs.

106.     In other words, unbeknownst to investors, this cash strapped AI company led by a shady CEO is the customer that Applied Digital spuriously touted as potentially worth $460 million in revenue to Applied Digital over 36 months.  Given that Stability AI did not have the funds needed to purchase eight thousand GPUs—which could cost $320 million—and Applied Digital did not have the infrastructure to place them, Applied Digital's announcement of the deal simply served to inflate the stock and facilitate fundraising.

32

107.    CW3 confirmed that the Company's claims of operating as a cloud services provider were illusory.  As CW3 stated that "there was no cloud," "no cloud backbone, no cloud control plane, no cloud infrastructure, nothing."  In fact, CW3 stated that the Company did not even use "puppet cloud" like Amazon Web Services or Microsoft Azure, "because they don't' even know how to use them.

108.    Also on June 26, 2023, on the heels of the customer announcements (and promises of hundreds of millions in potential revenues) which led the stock price to skyrocket, the Company announced a dilutive $125 million at the market ("ATM") offering "for the repayment of a term loan with B. Riley Commercial Capital, LLC and B. Riley Securities, Inc., the construction of new facilities and to address the Company's working capital needs," i.e., approximately 15.5 million shares at then current levels, reflecting a continuing desperate need for cash despite the imminent exorbitant revenue it claimed to expect from its first two AI customers starting that same month.

109.    As described further below, Applied Digital had initially classified the $36.5 million term loan from B. Riley that it planned to pay down using proceeds from the ATM offering, as a "long term party loan."  Indeed, the Company had only taken the loan out one month prior and it had a May 23, 2025 maturity date.  Nevertheless, with no justification provided, the Company paid down the remaining $36.5 million outstanding to B. Riley two years early though it needed the growth capex to continue expanding its operations and further its growth prospects.

110.    Continuing Defendants' penchant for touting misleading relationships to create an impression of affairs that differed from reality, that same month, on June 30, 2023 before market hours, the Company issued a press release touting a collaboration with Hewlett Packard to use its HPE Cray XD supercomputers, featuring NVIDIA H100 GPUs.  That day, Applied Digital's stock

closed up 12% from the June 29, 2023 close, and including the following trading day's closing price, closed up approximately 18% from the June 29, 2023 closing price.

111.    However, according to CW3, the whole company was "smoke and mirrors." Using the June 30, 2023 announcement as an example, CW3 stated that representations of a partnership with Hewlett Packard were not true. CW3 explained that the Company had simply "bought some stuff from HP. They just say stuff to make the stock go up, but it's not even the truth." Moreover, CW3 stated that the representation that the Company had bought Cray supercomputers from Hewlett Packard was false as well. CW3 described a conversation with Mike Maniscaclo who attended every meeting with Hewlett Packard and other vendors, and Mr. Maniscalco informed CW3 a few days after the announcement that Applied Digital had not actually gotten HPE Cray XD supercomputers from Hewlett Packard but rather "just a shi**y HP A-Series that they call the Crays now." CW3 stated that the conversation during which Mr. Maniscalco revealed this to CW3 is documented in a Microsoft Teams archive. Moreover, CW3 reported that Hewlett Packard communicated its dismay that the Company had reported a partnership between the two companies when in reality they had merely ordered product. According to CW3, Defendants Cummins and Rench both knew the partnership did not exist when they issued the press release. CW4 confirmed that the Company would misleadingly tout deals that bore no resemblance to reality.

112.    Further demonstrating that the Company lacked the infrastructure it needed to effectively operate as an AI cloud service provider is its lack of subdomains. According to CW2, cloud service providers typically have hundreds or even thousands of subdomains. Subdomains help control web traffic, create redundancies (a system design in which data is duplicated so there is a backup in the event of failure or damage), and help with security. For example, Rackspace has 1558 subdomains, Tencent Cloud has 103 subdomains, Seeweb has 128 subdomains,

34

CoreWeave, Inc. has 1,952 subdomains and GoDaddy.com LLP has 10,211 subdomains. Applied Digital has only eight, and Sai only has one. CW2 confirmed that a lack of subdomains is a "clear sign" that the Company is not capable of delivering the services it purports to deliver. When asked how the Company could operate as a cloud services provider with only eight subdomains, CW3 stated "it's not a cloud service." CW3 explained that the Company "doesn't even have the backend infrastructure for it and their datacenters lose internet connectivity frequently."

### The B. Riley Conflict and Applied Digital Board's Lack of Independence

113.    The Company's machinations, which qualify it more as a stock promoter than a provider of AI cloud services or HPC hosting, have been enabled by a conflicted Board of Directors controlled by B. Riley. Despite the Company's many pivots, the composition of its conflicted Board has largely remained the same.

114.    Since November 10, 2022, and throughout most of the Class Period, the Applied Digital Board of Directors has had six directors, including Defendant Cummins, Chuck Hastings, Kelli McDonald, Douglas Miller, Virginia Moore, and Richard Nottenburg. As a company publicly traded on the NASDAQ, Applied Digital is required to comply with Listing Rule 5605(b)(2), which states that a majority of the Company's Board must be comprised of independent directors. Nasdaq Listing Rule 5606(a)(2) defines an independent director as "a person other than an Executive Officer or employee of the Company or any other individual having a relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director." The purpose is to ensure that directors can, and will, exercise autonomous judgment.

115.    However, throughout the Class Period, Applied Digital's Board did not have a majority of independent directors. At least three of the six Board members-- Wes Cummins,

35

Chuck Hastings, and Virginia Moore—possessed close relationships with B. Riley, a related party, which (as set forth below) "interfere[d] with the exercise of independent judgment in carrying out the responsibilities of a director."  The Company nevertheless falsely claimed that Mr. Hastings and Ms. Moore were independent.

116.    While the IPO Prospectus and subsequent filings divulged that, in addition to sitting on Applied Digital's Board, Chuck Hastings also serves as the CEO of B. Riley Wealth Management and Virginia Moore is married to CEO of B. Riley Securities Andy Moore, the filings waved away any concerns regarding their independence, noncommittally claiming that any conflicts of interest were purely hypothetical.  Defendants also never made clear that B. Riley Wealth Management provides capital to funds managed by Defendant Cummins as President of B. Riley Asset Management.  Instead, the IPO Prospectus stated that certain conflicts of interest only "*may exist, or be perceived to exist*."  Defendants further assured investors that Applied Digital had "structured [its] Board composition and corporate governance in order to meet the requirements of the Nasdaq Global Select Market" and claimed to have "also included more than a majority of independent directors on our Board in order to ensure that there are limitations on the risks of conflicts of interest impacting Board level decisions."  Given Defendant Cummins, Chuck Hastings, and Virginia Moore's close ties to B. Riley, a related party, it did not.

117.    Indeed, when short seller The Friendly Bear (aka Nathan Koppikar) asked Andy Moore on Twitter how his wife Virginia qualifies as an "independent" member of Applied Digital's Board given the relationship, even Mr. Moore did not dispute her lack of independence, instead justifying that a "young operating company" often "call[s] on familiar relationships with individuals you trust":



118.    However, the Company for which Andy Moore is CEO, B. Riley Securities, handled the Company's IPO, makes loans to the Company, and publishes research about the Company.  It is a clear conflict of interest for his wife to site on the Company's Board.

119.    Ironically, and most troubling, is that Mr. Hastings and Ms. Moore held two of the three seats on Applied Digital's Nominating and Governance Committee, with Ms. Moore holding the position of Chair.  Applied Digital's IPO Prospectus and Forms 10-K during the Class Period falsely claimed that the Nominating and Governance Committee, "meets the requirements for independence under the current Nasdaq listing standards and SEC rules and regulations."  The filings also did not make clear that one task of the Nominating and Governance Committee *is to determine Board member independence*, a determination that two conflicted Board members cannot reasonably make about themselves.   Moreover, the Nominating and Governance

Committee is described as having the task of assessing the Board as a whole and each individual member for "potential conflicts of interest," but Ms. Moore and Mr. Hastings' relationships with B. Riley meant they themselves lacked independence and possessed problematic conflicts of interest.

120. Mr. Hastings also sat, and continues to sit, on the Company's Audit Committee. The Company represented that "each Audit Committee member meets the requirements for independence under the current Nasdaq Global Select Market listing standards and SEC rules and regulations." The independence of the Audit Committee is of paramount importance given that they are responsible for choosing the Company's registered public accounting firm, reviewing related party transactions, and considering the adequacy of internal controls. As set forth below, the Company engaged in related party transactions with B. Riley. Given that Mr. Hastings was CEO of B. Riley Wealth Management throughout the Class Period and at the time the Company engaged in the related party transactions with B. Riley, there is no question that he lacked independence. Moreover, the "registered public accounting firm" the Audit Committee approved was Marcum LLP, the very same accounting firm used by B. Riley, which the SEC recently fined for repeatedly violating audit standards.

121. Two other "independent" Board members, Douglas Miller, and Richard Nottenburg, the remaining two members of the Audit Committee, also possessed conflicted loyalties due to their close relationships with Defendant Cummins and B. Riley outside their roles on the Board. "Lead independent director," Douglas Miller and Defendant Cummins sat together on the Board of Directors of Telenav, Inc. from 2016 until 2021. Prior to joining the Telenav Board, Miller held the positions of Senior Vice President, Chief Financial Officer, and Treasurer of Telenav and Defendant Cummins owned 9% of Telenav's outstanding shares as manager of a

large investment fund at Nokomis Capital.  During their time together on the Telenav Board, Defendant Cummins and Miller were also selected to serve together on a special committee charged with reviewing sales solicitations for Telenav[6]. B. Riley served as that special committee's financial advisor.  Moreover, Defendant Cummins and "independent" board member Richard Nottenburg have sat, and continue to sit, on the board of Sequans Communications together since 2018.  B. Riley is Sequans' largest shareholder, owning 18.5% of its stock as of October 2023.  As with Telenav, Defendant Cummins heavily invested in Sequans as a fund manager.  None of Applied Digital's filings revealed the B. Riley connection to, or Defendant Cummins' investments in, either Telenav or Sequans.

122.     At no point during the Class Period did Defendants reveal that because three (and arguably five) Board members lacked independence given their relationships with related party B. Riley and Defendant Cummins, a significant risk existed that the Board could not exercise objective unbiased judgment when, *inter alia,* reviewing related party transactions, selecting a registered public accounting firm, and assessing Board independence.

123.     Indeed, beginning in 2005 and continuing throughout the Class Period, B. Riley wielded undue influence and control over Applied Digital given the companies' overlapping senior executives and exceedingly blurred lines.

124.     In 2002, Defendant Cummins joined B. Riley as one of twenty employees and over time assumed the rule of President.  When Defendant Cummins invested in Flight Safety Management (an earlier iteration of Applied Digital, as described above) and became a Board member in 2005, Bryant Riley-- the founder and CEO of B. Riley Financial-- beneficially owned more than 10% of the Company.

---

[6] https://www.businesswire.com/news/home/20201002005209/en/Telenav-Special-Committee-

125.    A 2008 Form 13-D filing shows that Defendant Cummins, still at B. Riley, held a 65% beneficial interest in Flight Safety Technologies through a company called Cummins Family Limited Partnership.

126.    In 2011, Defendant Cummins left B. Riley to start a hedge fund called 272 Capital. From March 2012 to December 2020, Defendant Cummins also held the position of sole officer of the Company, and has held the position of CEO, Secretary and Treasurer since March 2021. In August 2021, B. Riley Financial purchased 272 Capital, and Defendant Cummins became President of B. Riley Asset Management.

127.    During the Class Period, Bryant Riley owned over 2 million shares of Applied Digital stock *personally* along with his wife in a joint tenancy.  Collectively, B. Riley insiders owned nearly half of Applied Digital's shares in May 2023:

| APLD 424B3 filed 5/16/2023 p. 12-14<br>Name of Selling Stockholder | Shares Beneficially Owned Prior to Sale (b) | Shares Registered for Sale | % Owned Prior to Sale of Registered Shares | Shares Owned After Sale of Registered Shares (a) | % Owned After Sale of Registered Shares (a) |
|---|---|---|---|---|---|
| B. Riley Securities, Inc | 613,163 | 613,163 | * | - | * |
| PFSI Custodian FBO Carla Cummins IRA Account | 423,833 | 423,833 | * | - | * |
| Cummins Family Ltd. Partnership | 17,590,238 | 17,590,238 | 18.3% | - | * |
| Wesley Cummins | 23,300,868 | 21,196,849 | 24.3% | 2,104,019 | 2.2% |
| Wesley Cummins IRA Account | 742,166 | 742,166 | * | - | * |
| Virginia/Andrew Moore | 1,076,055 | 930,780 | 1.1% | 145,275 | * |
| Pamela L. Hastings Living Trust | 35,833 | 35,833 | * | - | * |
| Bryant and Carleen Riley JTWROS | 2,169,130 | 2,139,584 | 2.3% | 29,546 | * |
| Riley Investment Partners, LP | 427,833 | 427,833 | * | - | * |
| Totals | 46,379,119 | 44,100,279 | 48.4% | 2,278,840 | 2.4% |

% owned based on shares outstanding as of 5/1/23          95,908,964
(a) Assumes that the Selling Stockholders will have sold all of the securities covered by this prospectus upon the completion of the offering.
(b) Adjusted to reflect shares of which the Selling Stockholder has sole dispositive power over.
* Less than 1% of shares outstanding

128.    As explained above, though the Company disclosed that B. Riley is a related party and disclosed the simultaneous relationships of its CEO and two Board members with both Applied Digital and B. Riley, Defendants never disclosed that the Board therefore did not have a majority of independent directors and never disclosed the resulting risks and self-dealing that materialized as a result of the incestuous connection between the two companies.

40

129.    For example, in his role as President of B. Riley Asset Management, which is wholly owned by B. Riley Financial, Defendant Cummins purchased 80,000 shares of Applied Digital during a period of low trading volume in April and May of 2023, right before the Company announced it had secured its first two AI cloud services customers, causing the stock and trading volume to skyrocket.

| INSIDER | RELATION | LAST DATE ▼ | TRANSACTION | OWNER TYPE | SHARES TRADED | PRICE | SHARES HELD |
|---------|----------|-------------|-------------|------------|---------------|-------|-------------|
| CUMMINS WES | Officer | 05/17/2023 | Buy | Indirect | 10,000 | $6.17 | 19,620,924 |
| CUMMINS WES | Officer | 04/14/2023 | Buy | Indirect | 25,000 | $3.50 | 19,610,924 |
| CUMMINS WES | Officer | 04/13/2023 | Buy | Indirect | 25,000 | $3.60 | 19,585,924 |
| CUMMINS WES | Officer | 04/12/2023 | Buy | Indirect | 25,000 | $3.18 | 19,560,924 |

130.    Then, on June 27, 2023, B. Riley placed an $18 price target on Applied Digital—the day after the B. Riley members of Applied Digital's Board entered into the $125 million ATM Issuance Sales Agreement, per a Form 8-K the Company filed on June 26, 2023.

131.    Additionally, the Company's 2023 10-K revealed that it had already paid down a $36.5 million loan it had received from B. Riley only one and a half months prior, even though it cost the Company $2.5 million to borrow and then exit the loan:

> On May 23, 2023, SAI Computing LLC, a wholly-owned subsidiary of the Company ("Sai"), entered into a Loan and Security Agreement (the "B. Riley Loan") with B. Riley Commercial Capital, LLC and B. Riley Securities, Inc (collectively "B. Riley"). with the Company as Guarantor. The B. Riley Loan provides for a term loan of up to $50 million in the principal amount of 9.00% per annum. ***The proceeds of the B. Riley Loan will be used to provide additional liquidity to fund the buildout of the Company's recently announced AI cloud services platform and datacenters by Sai, and for general corporate purposes and working capital.*** The B. Riley Loan contains events of default and covenants customary for such an agreement. The B. Riley Loan is secured by a security

interest in substantially all of the assets of SAI as set forth in the B. Riley Loan and a security interest in any proceeds of Sai's operations. Pursuant to the B. Riley Loan agreement, the Company unconditionally guaranteed Sai's obligations to B. Riley. **_The B. Riley Loan contains initial fees of approximately $1.5 million that were reduced from the initial funds remitted to Sai. The B. Riley Loan also contains a term fee of $1 million that is due upon the Company's initial principal payment._** Finally, the B. Riley Loan and Security agreement contains a commitment fee of 3% on any balance outstanding as of each quarter end beginning with the calendar quarter ending September 30, 2023. **_As of May 31, 2023, the total outstanding balance under the B. Riley Loan was $36.5 million. The Company repaid the total balance of the B. Riley Loan on July 17, 2023_**.

132.    When the Company had initially announced on May 19, 2023 via press release that it had reached an agreement for the $36.5 million loan, _three days after announcing that Sai had reached a deal with the Company's first AI cloud services customer_, Defendant Cummins stated that the loan allowed the Company "to accelerate our growth in high performance computing digital infrastructure and our new Sai Computing AI Cloud platform for which we continue to see unprecedented demand."  Cummins further touted the loan as a sign of the Company's strength, stating:

> This additional funding is a **_continued endorsement of the strength of our business_** and illustrates our ability to secure low-cost, **_non-dilutive financing to fund a portion of our growth capital needs._**

Investors viewed the loan favorably and the stock price rose 16% after the issuance of the press release.  Yet, with no explanation, the Company gave the money back to its detriment just a few weeks later.

133.    In other words, Applied Digital took out a $36.5 million loan from B. Riley, incurring $1.5 million in fees, to purportedly help fund the buildout of its AI cloud services operation, then inexplicably paid the loan down in full just one and a half months later, incurring an additional $1 million fee, _though it still needed funds_.  The Company provided no business justification for its whiplash exit from the loan, which Defendant Cummins had described as "**_low cost_**," when the Company clearly needed cash as evidenced by its "**_dilutive_**" ATM offering days

before the payback.  It was the conflicted Board, stacked with significant loyalty to B. Riley, that authorized this quick repayment of the loan to the Company's detriment.  B. Riley, however, received $2.5 million in fees and a full repayment of the $36.5 million principal at exactly the time it needed to raise money for its $250 million acquisition of FRG.  Indeed, on July 25, 2023, *only one week after the Company paid down the loan*, B. Riley announced a $100 million equity offering to help fund the acquisition.

134.    Additionally troubling, as mentioned, is that B. Riley and Applied Digital have always shared the same dubious auditor, Marcum LLP, which serves to add to the unreasonably conflicted nature of the relationship between the two companies.  None of Applied Digital's filings disclosed to shareholders that the companies share an auditor with a shady reputation, and that B. Riley is one of the auditor's biggest clients.

135.    On June 21, 2023, the SEC charged Marcum "with systemic quality control failures and violations of audit standards in connection with audit work for hundreds of special purpose acquisition company (SPAC) clients beginning at the latest in 2020. The SEC's order also found that Marcum's deficiencies were not limited to SPAC clients, but they reflected systemic quality control failures throughout the firm. Marcum agreed to pay a $10 million penalty to settle the charges."  Specifically, the SEC found that as a result of Marcum's explosive growth *over a three-year period*, it began "churning out audits at an unsustainable pace causing widespread  quality control and audit standard violations that put its clients and the investing public at risk."  According to the SEC's press release announcing the charges, "violations were found in 25-50 percent of audits reviewed, with even more frequent, nearly wholesale violations found as to certain audit standards across Marcum's SPAC practice."  In particular, "[t]he order against Marcum finds it engaged in improper professional conduct within the meaning of Rule 102(e) of the SEC's Rules

of Practice, violated multiple audit standards across numerous engagements, and violated Rule 2-02(b)(1) of Regulation S-X."

136.    ***Nevertheless, even after the SEC levied these charges against Marcum, both Applied Digital and B. Riley continued to use Marcum as their auditor.***

137.    The incestuous connection between Applied and B. Riley is also evident from the fact that the two companies share the same office space.  On its website, Applied Digital lists 3811 Turtle Creek Blvd., Suite 2100, Dallas, TX75219 as its corporate address, yet in multiple SEC filings B. Riley also lists that same address and suite as its office space.

138.    CW4 confirmed that B. Riley and Applied Digital work in the same office space. In fact, though employed by Applied Digital, CW4 indirectly worked for B. Riley as well.  For example, CW4 would generate lists of Applied Digital's competitors, and would then provide a summary directly to B. Riley regarding those competitors including analyses of their earnings reports.  CW4 made clear that others, such as M. Saidal L. Mohmand, simultaneously worked for both companies as well.

### Insider Transactions

139.    During the Class Period Defendant Cummins sold or otherwise disposed of 107,066 shares of Applied Digital stock for proceeds of $450,973.  During the Class Period, Defendant Rench sold or otherwise disposed of 85,186 shares of Applied Digital stock for proceeds of $290,990.  During the Class Period, Director Virginia Moore sold or otherwise disposed of 1,270,712 for proceeds of at least $2,371,481, and Director Richard Nottenburg sold 14,820 shares of Applied Digital stock for proceeds of $114,707.

140.    Equally troubling is the timing of certain purchases of Applied Digital's B. Riley conflicted Board members.  As stated, in his role as President of B. Riley Asset Management,

which is wholly owned by B. Riley Financial, Defendant Cummins purchased 80,000 shares of Applied Digital during a period of low trading volume in April and May of 2023, right before the Company announced it had secured its first two AI cloud services customers, causing the stock and trading volume to skyrocket.

141.     Moreover, on April 4, 2023, just a few weeks before the Company announced its first AI cloud services customer, "independent" directors Hastings, Miller, Moore, and Nottenburg each acquired 94,821 shares of Applied Digital stock which closed at $2.22 that day and then soared to a high of $11.62 on June 23, 2023 in the wake of the Company's customer announcements.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

142.     The Class Period begins on April 13, 2022, when Applied Digital's securities began trading publicly on the NASDAQ.  In connection with the IPO, Applied Digital filed a Prospectus on Form 424(b)(4) with the SEC (the "IPO Prospectus").  The IPO Prospectus stated that it formed part of the Registration Statement, signed by Defendants Cummins and Rench.

143.     In describing the Company's hosting operation, the IPO Prospectus stated, in relevant part:

> *We are building Next-Gen datacenters which are designed to provide massive computing power*. Initially, these datacenters will primarily host servers securing the Bitcoin network *but can also host hardware for other applications such as artificial intelligence, machine learning* and other blockchain networks in the future.

144.     The foregoing statements were false and misleading because the Company was not building "next-gen datacenters" that could host anything other than crypto miners, because Defendants were shoddily constructing the datacenters using subpar components and did not have

the experience, infrastructure, funds, or capacity to operate as an AI cloud service provider or to provide next generation datacenter hosting for other HPC applications. *See* ¶¶70-112, *supra.*

145.   Further, as one of its "competitive strengths" and "growth strategies," the IPO Prospectus touted the fact that, "*[h]osting provides predictable, recurring revenue and cash flow to complement more volatile mining operations*."

146.   The foregoing statement was false and misleading because Defendants failed to reveal to investors that they were constructing their datacenter hosting facilities using subpar components that led to unsafe working conditions and outsize risks of power outages that could materially impact the Company's primary source of "predictable recurring revenue." ¶¶70-82, *supra*.

147.   When describing the Company's risk factors, the IPO Prospectus stated:

> We may also experience disruptions due to mechanical failure, power outage…Our systems may be susceptible to damage, interference, or interruption from … power loss…Such disruptions could materially and adversely affect our business and our financial condition, operating results, cash flows, and prospects.

148.   The foregoing statement was false and misleading because this disclosure of *hypothetical* risk did not inform investors that the risk of mechanical failure, power outage, damage, interference, or interruption from power loss that could impact operations and revenues had already been triggered when the Company began constructing its datacenters with subpar components. *See* ¶¶70-82, *supra.*

149.   In addition, in discussing the composition of the Board, the IPO Prospectus stated, that "we have structured our Board composition and corporate governance in order to meet the requirements of the Nasdaq Global Select Market."

150.    The foregoing statement was false and misleading because the Applied Digital Board did not have a majority of independent directors and thus did not meet the requirements of the Nasdaq Global Select Market. *See* ¶¶113-38, *supra.*

151.    In describing the committees of the Board, the IPO Prospectus stated, in relevant part:

> Our Board has established an audit committee, a compensation committee, and a nominating and governance committee, each of which have the composition and responsibilities described below. Members serve on these committees until their resignation or until otherwise determined by our Board. ***Each committee operates under a written charter approved by our Board that satisfies the applicable rules of the SEC and the listing standards of the Nasdaq Global Select Market***.

152.    The foregoing statement was false and misleading because each of the listed committees included Directors that lacked independence and thus did not meet the requirements of the Nasdaq Global Select Market. *See* ¶¶113-38, *supra.*

153.    Finally, assuring investors that the Audit Committee provided sufficient oversight over related party transactions, the IPO Prospectus stated:

> In July 2021, we adopted a charter of the audit committee, pursuant to which all related party transactions including those between us, our directors, executive officers, majority stockholders and each of our respective affiliates or family members will be reviewed and approved by our audit committee, or if no audit committee exists, by a majority of the independent members of our Board. ***Our existing policies are designed to comply with applicable rules and regulations of the SEC and the listing requirements and rules of Nasdaq.***

154.    The foregoing statement was false and misleading because each member of the Audit Committee had a conflict due to their relationships with B. Riley and Defendant Cummins and thus lacked the independence necessary to objectively review related party transactions with B. Riley under the requirements of the Nasdaq Global Select Market. *See* ¶¶113-38, *supra.*

155.    On May 13, 2022, Applied Digital issued a press release announcing the Company's fiscal Q3 2022 financial results and providing an operational update.  The press release which referred to the Jamestown datacenter as "*Next-Gen*," quoted Defendant Cummins:

> **We are now building Applied Blockchain to be the leading provider of next-gen datacenters that are designed to provide massive computing power**," said [Defendant] Cummins. "We went from breaking ground to opening our first facility in under six months, **demonstrating the capabilities of our operationally focused and experienced team**.

156.    The foregoing statements were false and misleading because Applied Digital's datacenters were not "next-gen" or "designed to provide massive computing power," i.e. HPC applications in addition to crypto mining, because Defendants had shoddily constructed the datacenters using subpar components, its existing datacenters were at max capacity with crypto miners, and the Company did not have the experience, infrastructure, funds, or capacity necessary to host HPC applications.  *See* ¶¶70-112, *supra*.  Moreover, Defendant Cummins failed to reveal that the speed in which the Company had constructed the Jamestown facility reflected a strategy of cutting corners and using subpar components to get the facility up and running quickly and cheaply despite the resulting risks relating to, *inter alia*, safety and power outages.

157.    The press release further announced that the Company had broken ground on the Garden City, Texas facility and stated that the Garden City facility would achieve a 200MW capacity:

> On November 24, 2021, Applied Blockchain entered into a letter of intent to develop a facility in Texas **with 200MW** of wind power. Construction of the facility began in April 2022 and is expected to be operational in the latter half of the calendar year.

158.    The foregoing statement was false and misleading because Defendants failed to reveal to investors that they were constructing their datacenter hosting facilities using subpar components that led to unsafe working conditions and outsize risks of power outages that could

materially impact the Company's primary source of revenue, and that its Garden City datacenter would never be able to achieve a 200MW capacity. *See* ¶¶70-82, *supra*.

159.    In the Form 10-Q the Company filed for Q3 2022, Defendants once again claimed its datacenters were "next generation" and capable of hosing AI and machine learning applications:

> **We build and operate Next-Gen datacenters which are designed to provide massive computing power**…these datacenters primarily will host servers securing the Bitcoin network **but can also host hardware for other applications such as artificial intelligence, machine learning** and other blockchain networks in the future.

160.    The foregoing statements were false and misleading because Applied Digital's datacenters were not "next-gen," "designed to provide massive computing power," i.e. HPC, or capable of hosting AI or machine learning applications, because Defendants had shoddily constructed the datacenters using subpar components, its existing datacenters were at max capacity with crypto miners, and the Company did not have the experience, infrastructure, funds, or capacity necessary to host AI, machine learning, or HPC applications. *See* ¶¶70-112, *supra*.

161.    That same day, Applied Digital hosted an earnings call with investors and analysts to discuss the Company's Q3 2022 results. During the earnings call, Defendant Cummins stated:

> **We're now building Applied Blockchain to be a leading provider of next-gen datacenters that are designed to provide massive computing power.**
>
> ***
>
> [W]e have assembled a strong team of dedicated power **infrastructure experts with proficiency in design, building, and operating next-gen datacenters**. I will put our team up against anyone in the industry.

162.    Then, comparing the advantages of Applied Digital's purportedly "next-gen" datacenters to traditional datacenters, Defendant Cummins further stated that:

> **The next-generation datacenters we're developing are optimized for large computing power** and require more power than traditional datacenters that are optimized for data retention and retrieval.

49

163.     The foregoing statements were false and misleading because Applied Digital was not building "next-gen datacenters that are designed to provide massive computing power," i.e. HPC, or capable of hosting AI or machine learning applications because Defendants had shoddily constructed the datacenters using subpar components, its existing datacenters were at max capacity with crypto miners, and the Company did not have the experience, infrastructure, funds, or capacity necessary to host AI, machine learning, or HPC applications.  *See* ¶¶70-112, *supra*.

164.     Defendant Cummins also made clear that the Company repeated the same strategy used to construct Jamestown to begin constructing subsequent facilities:

> We've developed a robust pipeline of potential power sources and *our experience at our first facility has provided us a blueprint for repeatable strategy* to significantly scale our operations.

165.     The foregoing statement mislead investors because Defendants failed to reveal that their "repeatable strategy" included constructing datacenter hosting facilities using subpar components, including transformers, that led to unsafe working conditions and outsize risks of power outages that could materially impact the Company's primary source of revenue. *See* ¶¶70-82, *supra*.

166.     On August 25, 2022, the Company issued a press release announcing its planned name change from Applied Blockchain to Applied Digital.  The press release stated:

> While Applied Blockchain continues to be a premier provider of digital infrastructure for many cryptocurrency mining operations, it is important for the Company to distinguish that *its next-generation datacenters support many other high-performance compute (HPC) applications*.

167.     The foregoing statements were false and misleading because Applied Digital's datacenters were not "next generation" and could not "support many other high-performance compute (HPC) applications," because Defendants had shoddily constructed the datacenters using subpar components, its existing datacenters were at max capacity with crypto miners, and the

50

Company did not have the experience, infrastructure, funds, or capacity necessary to host HPC applications.  *See* ¶¶70-112, *supra*.

168.    That same day, Applied Digital issued a press release announcing the Company's fiscal Q4 and full year 2022 financial results.  The press release stated that the:

> Continued buildout of the second facility, a ***200-MW datacenter*** in Garden City, Texas, [] is ***ahead of schedule for energization*** in the fourth calendar quarter of 2022.

169.    The foregoing statement was false and misleading because Defendants failed to reveal to investors that they were constructing the Garden City datacenter using subpar components that led to unsafe working conditions and outsize risks of power outages that could materially impact the Company's primary source of revenue, that its Garden City datacenter would never be able to achieve a 200MW capacity, and that they were not "ahead of schedule for energization." *See* ¶¶70-82, *supra*.

170.    Also on August 25, 2022, Applied Digital hosted an earnings call with investors and analysts to discuss the Company's Q4 2022 results  During the earnings call, Defendant Cummins was asked about the HPC opportunity, to which he responded in relevant part:

> we have really ultra-low cost locations, great power prices, all the things that you want to use for Bitcoin mining, ***but it can be used for HPC as well***...

171.    The foregoing statements were false and misleading because Applied Digital could not use its existing datacenters for HPC, or anything other than Bitcoin mining, because Defendants had shoddily constructed the datacenters using subpar components, its existing datacenters were at max capacity with crypto miners, and the Company did not have the experience, infrastructure, funds, or capacity necessary to host HPC applications. *See* ¶¶70-112, *supra*.

172.     Reporting on the Company's progress with its second datacenter in Garden City, Defendant Cummins stated in relevant part:

> Our second facility is co- located with a wind farm in Garden City, Texas with plant capacity of ***200 megawatts***. Construction began in late April and the first buildings have been constructed with the majority of the electrical equipment required already on site. Our base case expectation is we will begin energizing Garden City in the fourth calendar quarter of 2022. But ***we are currently ahead of schedule*** so there may be some upside to the start date.
>
> ***
>
> We've placed orders for ***transformers*** over six months ago, we basically held the place in line for that, that part is actually gotten a little easier for us, we have this switch gear.

173.     The foregoing statements were false and misleading because Defendants failed to reveal to investors that they were constructing their datacenter hosting facilities using subpar components (including the transformers they had ordered six months prior) that led to unsafe working conditions and outsize risks of power outages that could materially impact the Company's primary source of revenue, that its Garden City datacenter could never achieve a 200MW capacity, and that they were not ahead of schedule. *See* ¶¶70-82, *supra*.

174.     In the 2022 Form 10-K filed on August 29, 2022, reporting the Company's financial and operating results for the year ended May 31, 2022, signed by Defendants Cummins and Rench, Defendants repeated their characterizations of the Company's datacenters as "Next-Gen" and capable of hosting AI and machine learning applications:

> ***We design, build, and operate Next-Gen datacenters which are designed to provide massive computing power and support high-compute applications***. Initially, these datacenters will primarily host servers securing the Bitcoin network but ***can also host hardware for other applications such as artificial intelligence, machine learning*** and other blockchain networks in the future.

175.     The foregoing statements were false and misleading because Applied Digital's datacenters were not "next generation," "designed to provide massive computing power and

52

support high-compute applications," or capable of hosting AI or machine learning applications, because Defendants had shoddily constructed the datacenters using subpar components, its existing datacenters were at max capacity with crypto miners, and the Company did not have the experience, infrastructure, funds, or capacity necessary to host AI, machine learning, or HPC applications. *See* ¶¶70-112, *supra*.

176.    The 2022 10-K also contained substantively similar descriptions of the Board's composition, independence, and committees as set forth in the IPO Prospectus, and were misleading for the same reasons indicated *supra*, ¶¶113-38, 149-54.

177.    The 2022 10-K further repeated statements regarding the Company's use of its "repeatable power strategy" to construct its second facility in Garden City (which it continued to falsely represent would have a 200MW capacity), and to construct its third facility in Ellendale, North Dakota.  These statements were false and misleading for the reasons stated in ¶¶70-82, *supra*.

178.    Finally, the 2022 10-K once again described the Company's risk factors pertaining to power outages as purely hypothetical, stating:

> We <u>may</u> experience disruptions due to mechanical failure, power outage…Our systems <u>may</u> be susceptible to damage, interference, or interruption from … power loss…Such disruptions could materially and adversely affect our business and our financial condition, operating results, cash flows, and prospects.

179.    The foregoing statements were false and misleading because this disclosure of *hypothetical* risk did not inform investors that the risk of mechanical failure, power outage, damage, interference, or interruption from power loss that could impact operations and revenues had already been triggered when the Company began constructing its datacenters with subpar components. *See* ¶¶70-82, *supra*.

180.    On October 11, 2022, Applied Digital issued a press release announcing the Company's fiscal Q1 2023 financial results and providing an operational update.  Therein, the Company once again described itself as, "a designer, builder and operator of ***next-generation datacenters*** that provide power to blockchain infrastructure ***and support High-Performance Computing (HPC) applications***."  The press release went on to discuss the proposed name change, stating that the change, "***reflect[ed] the Company's broad services and offerings for HPC applications***."

181.    The foregoing statements were false and misleading because Applied Digital's datacenters were not "next generation" and could not support both blockchain infrastructure and HPC applications because Defendants had shoddily constructed the datacenters using subpar components, its existing datacenters were at max capacity with crypto miners, and the Company did not have the experience, infrastructure, funds, or capacity necessary to host HPC applications. *See* ¶¶70-112, *supra*.

182.    That same day, Applied Digital hosted an earnings call with investors and analysts to discuss the Company's Q1 2023 results.  During the earnings call, Defendant Cummins stated, in relevant part:

> ***Our name change will more accurately reflect our services and broader business offerings that serve customers that require large computing power applications.*** While these large computing power applications can include Bitcoin miners which compromise our current customer base, we see a much larger market opportunity pertaining to ***high performance computing applications relating to image processing, graphics rendering, artificial intelligence and machine learning***.

183.    The foregoing statements were false and misleading because Applied Digital's datacenters could not accommodate customers requiring large computing power applications aside from crypto mining and were not capable of hosting AI or machine learning applications because Defendants had shoddily constructed the datacenters using subpar components, its existing

datacenters were at max capacity with crypto miners, and the Company did not have the experience, infrastructure, funds, or capacity necessary to host AI, machine learning, or HPC applications.  *See* ¶¶70-112, *supra*.

184.   On November 17, 2022, the Company issued a press release announcing that it had officially changed its name to Applied Digital.  The press release stated, in relevant part:

> The Company's refreshed name more accurately reflects its mission, services and broader business offerings to serve customers that require large amounts of computing power for applications. While Applied Digital continues to be a premier provider of digital infrastructure for cryptocurrency mining operations, considered HPC applications, it is important for the Company to distinguish that ***its next-generation datacenters support many other HPC applications as well***.

185.   The foregoing statements were false and misleading because Applied Digital's datacenters were not "next generation" and could not support "many other HPC applications" because Defendants had shoddily constructed the datacenters using subpar components, its existing datacenters were at max capacity with crypto miners, and the Company did not have the experience, infrastructure, funds, or capacity necessary to host HPC applications.  *See* ¶¶70-112, *supra*.

186.   On January 9, 2023, Applied Digital issued a press release announcing the Company's fiscal Q2 2023 financial results and providing an operational update.  The press release once again falsely referred to the Company as "***a designer, builder and operator of next-generation digital infrastructure that is designed for High Performance Computing ("HPC") applications***," and stated, in relevant part:

> "Our fiscal second quarter was characterized by growth and adaptability, as we operated our Jamestown facility at full capacity for the entirety of the quarter while simultaneously ***growing our non-cryptocurrency opportunity set***," said [Defendant] Cummins. "Following our corporate name change, we secured our first two non-cryptocurrency customers, one of which will be hosted in a new 5MW specialized processing center.

"In parallel with our newer strategic objectives, *we continued to progress our next two datacenters, Garden City and Ellendale*, both of which we anticipate to begin energizing by the end of February. Once fully online, we will have nearly 500MW of hosting capacity that we expect will put us at an annualized adjusted EBITDA run rate of approximately $100 million.

187.     The foregoing statements were false and misleading because Applied Digital was not growing any "non-cryptocurrency opportunity" as its datacenters could not accommodate customers requiring large computing power applications aside from crypto mining and were not capable of hosting AI or machine learning applications because, following the same "repeatable strategy," Defendants had shoddily constructed the datacenters using subpar components, its existing datacenters were at max capacity with crypto miners, and the Company did not have the experience, infrastructure, funds, or capacity necessary to host AI, machine learning, or HPC applications. *See* ¶¶70-112, *supra*.

188.     That same day, Applied Digital hosted an earnings call with investors and analysts to discuss the Company's Q2 2023 results.  During the earnings call, Defendant Cummins touted the Company's next generation datacenters and ability to support other HPC applications, stating in relevant part:

Ultimately, our core assets are low cost and reliable power contracts and *our next generation data centers, which we have wide-ranging use cases beyond cryptocurrency, including applications and machine learning, artificial intelligence, image processing, graphics rendering and various Web 3 applications*. We will remain a premier provider of digital infrastructure for cryptocurrency miners, but it's important for us as a company to distinguish that *our next-generation data centers support many other HPC applications* as we look to capitalize on the rapid, rapidly growing high performance computing market which is set to reach $65 billion globally by 2030.

***

Lastly, the other strategic focus for us is to *continue building out our non-crypto use cases to demonstrate the broad capabilities of our next generation datacenter assets*. … With *our proven ability to construct and operate low cost next generation datacenters*, we remain confident that Applied Digital will continue to be a *leader in digital infrastructure* in the digital infrastructure industry and

56

capitalize on this market opportunity that is set to hit approximately $65 billion by 2030.

189.     The foregoing statements were false and misleading because Applied Digital was not building a non-cryptocurrency business as its datacenters were not "next generation," could not accommodate customers requiring large computing power applications aside from crypto mining, and were not capable of hosting AI or machine learning applications because, following the same "repeatable strategy," Defendants had shoddily constructed the datacenters using subpar components, its existing datacenters were at max capacity with crypto miners, and the Company did not have the experience, infrastructure, funds, or capacity necessary to host AI, machine learning, or HPC applications.  *See* ¶¶70-112, *supra*.

190.     Moreover, when asked by an analyst regarding the status of the Garden City facility given prior representations that it was ahead of schedule and would be operational in 2022, Defendant Cummins responded:

> The last pieces of the puzzle here are mostly technical around metering and instrumentation transformers. And so we're finalizing that. And then so we expect to finalize that, obviously on the timeline that we said and energize before the end of February.

191.     The foregoing statement was false and misleading because Defendants failed to reveal to investors that they had constructed the Garden City datacenter hosting facility using subpar components that led to unsafe working conditions and outsize risks of power outages that could materially impact the Company's primary source of revenue, that its Garden City datacenter would never be able to achieve a 200MW capacity, and that delays were caused by issues with subpar components used to power the facility and disagreements with Texas regarding the power capacity. *See* ¶¶72-78, *supra*.

192.     On April 6, 2023, Applied Digital issued a press release announcing the Company's fiscal Q3 2023 financial results and providing an operational update.  The press release once again

falsely referred to the Company as "*a designer, builder and operator of next-generation digital infrastructure that is designed for High Performance Computing ("HPC") applications*," and also stated:

> Applied Digital's **next-generation datacenters are ideal hosting sites for HPC applications** that can offer lower cost, high compute power solutions compared to traditional datacenters that are typically higher cost and do not have the ability in most current facilities to provide the power density required for AI/ML workloads.

193.    Defendant Cummins further stated, in relevant part that the Company had:

> successfully initiated energization of our 180 MW facility in Ellendale, North Dakota in early March. In addition to Ellendale, we are making great progress at our 200 MW facility in Garden City, Texas and are ready to power on the site following approval of technical details given the unique aspects of the facility."

194.    The foregoing statements were false and misleading because the Company did not have "next-gen datacenters" and its existing datacenters could not host anything other than crypto miners because Defendants had shoddily constructed the datacenters using subpar components and did not have the experience, infrastructure, funds, or capacity to operate as an AI cloud service provider or to provide next generation datacenter hosting for other HPC applications.  *See* ¶¶70-112, *supra*.  Moreover, Defendant Cummins' statements regarding the Garden City and Ellendale facilities were false and misleading because Defendant Cummins failed to disclose that the Garden City facility could never attain 200MW and because the Company constructed the datacenters using subpar components triggering outsize risks of power outages that could materially impact the Company's primary source of revenue. *See* ¶¶70-82, *supra*.

195.    On May 15, 2023, Applied Digital issued a press release entitled "Applied Digital Launches Cloud Service to Empower Artificial Intelligence Applications."  The press release stated, in relevant part:

> Applied Digital [. . .] today announced the launch of its Artificial Intelligence (AI) Cloud services that will provide high-performance computing power for AI applications, including large language model training, graphics rendering, and

more. The AI Cloud services will be offered through Sai Computing, a wholly-owned subsidiary of Applied Digital, and will serve as the brand through which the services will be marketed.

***

"***Applied Digital's differentiated datacenter infrastructure uniquely positions us to meet the sophisticated and demanding workloads required for businesses to leverage AI and other HPC applications***," [Defendant] Cummins added. "With the launch of our AI cloud service, we are able to expand our offerings and further capitalize on the unprecedented demand we are seeing from customers for our services. Applied Digital aims to be at the forefront of providing the next generation of needed services that enable and deliver on the untapped future of AI."

196.    The foregoing statements were false and misleading because the Company did not in fact have the experience, infrastructure, funds, or capacity to operate as an AI cloud service provider.  *See* ¶¶70-112, *supra.*

197.    Also on May 16, 2023, the Company announced that it had signed its first major AI cloud computing customer. Specifically, the press release announced that the Company's:

recently launched AI Cloud Service, through its wholly-owned subsidiary Sai Computing, has secured its first major AI customer with an agreement ***worth up to $180 million over a 24-month period***.

Defendant Cummins described the deal as the "***tip of the iceberg***."

198.    The foregoing statements were false and misleading because the Company did not have the experience, infrastructure, funds, or capacity to effectively operate as a cloud services provider and thus could not realize anywhere near $180 million in revenue from any cloud services customer.  Moreover, Defendants failed to reveal that Sai was not actually a separate company but solely existed on paper to provide the false illusion of a separate cloud services company that operated under the Applied Digital umbrella.

199.    On May 24, 2023, Applied Digital filed a Current Report on Form 8-K with the SEC which stated, in relevant part:

59

On May 23, 2023, SAI Computing LLC (the "Borrower"), a wholly-owned subsidiary of [Applied Digital], entered into a Loan and Security Agreement with B. Riley Commercial Capital, LLC and B. Riley Securities, Inc. (the "Lenders"), B. Riley Commercial Capital, LLC, as Collateral Agent, and the Company as Guarantor (the "Loan and Security Agreement"). The Loan and Security Agreement provides for a term loan (the "Loan") in the principal amount of $50,000,000 with a maturity date of May 23, 2025. At the closing on May 23, 2023, the Lenders advanced to the Borrower $36,500,000, with the remaining $13,500,000 to be advanced at the sole discretion of the Lenders.

The Loan and Security Agreement provides for an interest rate of 9.00% per annum. The proceeds of the Loan *will be used to provide additional liquidity to fund the buildout of the Company's recently announced AI cloud platform and datacenters by the Borrower, and for general corporate purposes and working capital*. The Loan and Security Agreement contains events of default and covenants customary for such an agreement.

200.     The foregoing statements were false and misleading because the Company would not use the "additional liquidity to fund the buildout of the Company's recently announced AI cloud platform and datacenters by the Borrower, and for general corporate purposes and working capital," but instead would repay the loan in full within a month and a half using funds from a highly dilutive offering, and incurring $2.5 million in fees to B. Riley to the benefit of B. Riley and the detriment of Applied Digital's shareholders.

201.     That same day, the Company announced that it began working with Supermicro "to deliver Applied Digitals' AI Cloud service."  Specifically, the press release stated:

*Supermicro is a leading provider of application-optimized, high-performance server and storage solutions that address a broad range of computational-intensive workloads*. Supermicro's next-generation GPU servers significantly lower the power requirements of data centers.

*** *

*Applied Digital's next-generation datacenters are ideal for hosting HPC applications on premises*. This solution provides lower cost, high compute power to replenish the power density needed for AI/ML workloads.

202.     The foregoing statements were false and misleading because Supermicro was not a "leading provider of application-optimized, high-performance server and storage solutions that

address a broad range of computational-intensive workloads," but rather a cheap second tier brand providing hardware plagued by bugs.  Moreover, Applied Digital's datacenters were not "next generation" or "ideal for hosting HPC applications on premises," because Defendants had shoddily constructed the datacenters using subpar components, its existing datacenters were at max capacity with crypto miners, and the Company did not have the experience, infrastructure, funds, or capacity necessary to host HPC applications.  *See ¶¶70-112, supra.*

203.    On June 23, 2023, the Company announced before market hours that it secured a second cloud services customer in the AI industry through Sai, potentially worth $460 million over 36 months, substantially more revenue than announced for its first customer on May 16.  In the press release, Defendant Cummins referenced the growth of the AI industry at "unprecedented levels," and stated, "[t]his agreement marks another milestone in ***APLD's HPC/AI Infrastructure*** growth trajectory as we continue to strategically expand our focus on artificial intelligence cloud services ***in addition to our next-generation datacenter***."  The press release further touted the Company's "Next-Gen" datacenters as compared to traditional datacenters, stating:

> ***The datacenters are ideal for hosting HPC applications*** that offer lower-cost, high-efficiency solutions compared to traditional datacenters that typically do not have the ability to provide the power density required for AI workloads.

204.    The foregoing statements were false and misleading because the Company did not have the experience, infrastructure, funds, or capacity to effectively operate as a cloud services provider and thus could not realize anywhere near $460 million in revenue from any cloud services customer.  Additionally, Applied Digital's datacenters were not "next generation" or "ideal for hosting HPC applications on premises," because Defendants had shoddily constructed the datacenters using subpar components, its existing datacenters were at max capacity with crypto miners, and the Company did not have the experience, infrastructure, funds, or capacity necessary to host HPC applications.  *See ¶¶70-112, supra.*  Finally, Defendants failed to reveal that the

second customer was Stability AI, a company run by the shady Emad Mostaque, which did not have the ability to supply anywhere near the level of revenue the Company touted given that Stability AI burned through cash and struggled to generate revenues. *See* ¶¶102-06, *supra.*

205.    Also on June 23, 2023, the Company issued a press release announcing the energization of the Ellendale datacenter, which, like the Company's other press releases falsely stated that the Company is "***a designer, builder, and operator of next-generation digital infrastructure that is designed for High-Performance Computing ("HPC") applications,***" and referred to the Ellendale datacenter as "***cutting edge***."

206.    The foregoing statements were false and misleading because the Company did not operate "next-generation datacenters" that could handle HPC applications, and its Ellendale datacenter was not "cutting edge," but rather at risk of a serious power outage that could materially impact revenues because Defendants had shoddily constructed the datacenters using subpar components and did not have the experience, infrastructure, funds, or capacity to operate as an AI cloud service provider or to provide next generation datacenter hosting for other HPC applications. *See* ¶¶70-112, *supra.*

207.    The press release also touted the launch of the Company's "Cloud Services," stating:

> Applied Digital also recently announced the launch of its Cloud Services which will provide high-performance computing power for high-density applications. In conjunction with the launch of its Cloud Services, the Company announced the signing of its first AI customer with an agreement worth up to $180 million over 24-months.

208.    The foregoing statements were false and misleading because the Company did not have the experience, infrastructure, funds, or capacity to effectively operate as a cloud services provider and thus could not realize anywhere near $180 million in revenue from any cloud services customer over the subsequent 24 months.

209.    While the stock initially skyrocketed on news of the second customer signing and the energization of the Ellendale datacenter, the stock ultimately closed down because on June 23, 2023, Applied Digital also filed a current report on Form 8-K with the SEC, which stated, in relevant part:

> On June 23, 2023, the Company announced that its Audit Committee has conducted an internal investigation into a threat, but not a formal assertion, of a sexual harassment claim by Regina Ingel, its Chief Marketing Officer, based on a personal relationship between Ms. Ingel and Wes Cummins, the Company's Chief Executive Officer. Based on information obtained through the investigation, **_the Audit Committee determined that the relationship between the parties was consensual and the allegations of workplace harassment are unfounded_**. The Board has reaffirmed Mr. Cummins' role as Chief Executive Officer of the Company and will consider any additional actions that may be appropriate with respect to this matter.

210.    On this news, Applied Digital's stock price fell $1.58 per share, or 16.34%, to close at $8.09 per share on June 23, 2023.  The press release failed to reveal that the Audit Committee was populated with conflicted directors holding dual loyalties to Defendant Cummins and B. Riley.

211.    On June 30, 2023, the Company issued a press release with the same false characterization of its business, and announcing a "**_Strategic Collaboration With Hewlett Packard Enterprise to Deliver AI Cloud Services_**," which also once again touted the signing of its $460 million AI cloud services customer and further stated in relevant part:

> **_Applied Digital will leverage HPE Cray XD supercomputers_**, featuring NVIDIA H100 GPUs, to enhance its AI Cloud service and efficiently support critical workloads such as AI, machine learning, rendering, and HPC tasks involving digital modeling and simulation. By harnessing the power of HPE's supercomputers, Applied Digital will provide its customers with maximum performance to support compute and data-intensive needs with cost-effective solutions.

212.    The foregoing statements were false and misleading because the Company did not have any partnership or strategic collaboration with Hewlett Packard nor did it have any of Hewlett Packard's actual HPE Cray XD supercomputers, but rather had purchased Hewlett Packard's HP A-Series that they referred to as Crays.  Moreover, the statements touting the $460 million AI

cloud services customer were false and misleading because the Company did not have the experience, infrastructure, funds, or capacity to effectively operate as a cloud services provider, nor did Stability AI have the funds to pay hundreds of thousands in revenue, and Applied Digital thus could not realize anywhere near $460 million in revenue from any cloud services customer, much less Stability AI, in the next 36 months.

### THE TRUTH BEGINS TO EMERGE WHILE DEFENDANTS CONTINUE TO MISLEAD INVESTORS

213.    On July 6, 2023, the truth began to emerge regarding the Applied Digital Board's lack of independence, conflicted interests with B. Riley, and inability to operate successfully as am AI cloud services provider or host of HPC applications aside from crypto mining, when market analysts Wolfpack Research and The Bear Cave published short reports on Applied Digital.

214.    The Wolfpack Report, authored by Dan David, entitled "APLD: An Embarrassing and Predictable Stock Promotion," stated, in relevant part:

> Applied Digital [. . .], a potato farm turned failed bitcoin miner, pumped up its stock in May by claiming to pivot from a floundering business hosting bitcoin miners, to becoming a low-cost AI Cloud service provider. The explosion of interest in AI after the emergence of Chat GPT has predictably attracted the worst promoters and scumbags to peddle fake AI wares to credulous investors, and our analysis indicates that APLD is one of these grifters because it is not an AI company[.]

215.    Mr. David backed up his conclusions with an analysis not done any other market participant prior to that day.   The Wolfpack Report included an analysis of the troubling relationship between B. Riley and Applied Digital, which made abundantly clear that Applied Digital's Board is far from independent and thus does not comply with Nasdaq Global Select Market rules or SEC rules given that three Applied Digital Directors simultaneously act as (or are married to) B. Riley senior level executives.   Indeed, according to Mr. David, B. Riley's relationship with Applied Digital waves troubling red flags:

One clue that this is a stock promotion is the heavy involvement of our favorite bottom feeding investment bank, B. Riley, whose insiders (including Wes Cummins who simultaneously serves as the President of B. Riley Asset Management and the CEO of APLD) own 48.4% of APLD. These B. Riley insiders coincidentally registered 95% of their shares for sale the same day APLD's stock rose 320% due to a press release announcing that a mystery customer had signed a deal potentially worth up to $180 million.

***

The board is highly conflicted and, in our opinion, incompetent. Bryant Riley owns over 2 million shares of APLD, and his underlings include Wes Cummins the CEO; Chuck Hastings, an "independent" director who also serves as the CEO of B. Riley Wealth Management; and Andy Moore, the CEO of B. Riley Securities, whose wife, Virginia Moore, also serves on the board as an "independent" director.

B. Riley's transparently self-serving rating on APLD is a BUY with an $18 price target, which would increase the wealth of the B. Riley insiders holding the stock by ~$400 million. Yet the insiders have filed a shelf registration to sell 95% of their shares, and Bryant Riley's underlings on APLD's board have launched a $125 million at the market equity offering (ATM), in part to repay the company's $36.5 million loan from B. Riley.

The fact that the board has essentially remained unchanged, despite the fact that APLD has switched its business model every few months since it remerged in 2021, indicates that the board lacks competence. One of the board members seems to have no pertinent experience in datacenters or bitcoin mining whatsoever, having primarily spent her time dedicated to early childhood education.

The board's incompetence was only highlighted when the CEO was caught in an embarrassing sex scandal, where the board appears to not have hired outside counsel to investigate, but used its Audit Committee instead. APLD's Audit Committee, which is comprised of two old white men and one of the CEO's fellow executives at B. Riley, decided the accusations were "unfounded" because the relationship with a balloon-display entrepreneur turned CMO had been "consensual."

216.    Additionally, the Wolfpack Report demonstrated how Applied Digital's claims of pivoting from cryptocurrency mining to AI cloud services, "is not credible and its CEO cannot keep the story straight."  Specifically, Mr. David highlights the discrepancies in Defendant Cummins' statements on earnings calls and on Twitter regarding the Company's plans to procure thousands of GPUs to run its cloud services business, and then analyzes the cost of GPUs, Applied

Digital's cash struggles, constant need to raise money (including the dilutive $125 million ATM it used to prematurely and pay back the $36.5 million B. Riley loan), and market capitalization, to conclude that the Company could not possibly secure much less afford the GPUs it needs to run an AI cloud services business.

217.    Further signs that the Company's "AI business has no substance" revealed in the Wolfpack Report, which it based on research into technology company subdomains and on an expert interview, include that Applied Digital only has eight subdomains (Sai has one) and lacks the physical infrastructure to run an AI business:

> Lack of subdomains: "APLD has just eight subdomains. We spoke with an expert who said, "there is no [expletive] way you can run a digital cloud platform on eight subdomains." Technology companies, especially cloud providers, typically use many subdomains to help direct web-traffic, manage security, and provide redundancies. A private datacenter in Saskatchewan called Blacksun, that has 20 employees and is much smaller than APLD, has 235 subdomains. CoreWeave is a datacenter cloud provider that, like APLD, has three datacenters in the U.S. has nearly 2,000 subdomains. APLD's subsidiary, Sai Computing, which is the entity that supposedly struck deals with two AI customers, only has one subdomain. Even more embarrassingly, its website only has two pages, and can only capture emails."

> Lack of physical infrastructure: "APLD's current power capacity is contracted out to bitcoin miners, so it does not even have the physical infrastructure to host 26,000 GPUs. APLD's assertion that it has 200MW of high-power computing space in the pipeline is extremely misleading considering that APLD has not even named a site to start building."

218.    Further, the Wolfpack Report revealed that Applied Digital "does not seem to know what it's doing" when it comes to building its datacenters:

> Whether focusing on Bitcoin mining, or launching an AI Cloud Service, the one common ingredient for APLD's many business plans has been the need for functioning data centers. **The problem for investors is that when it comes to building out data enters, APLD does not seem to know what it's doing**.

219.    The Wolfpack Report also revealed *for the first time* that Applied Digital's highly touted $460 million customer is Stability AI, "one of the most dubious AI start-ups in a field awash with speculative promotions."  In addition to revealing the identity of this highly touted customer

for the first time the Wolfpack Report also included an in-depth analysis demonstrating that Applied Digital hid from investors that its second AI cloud services customer cannot actually afford to pay Applied Digital anywhere near $460 million in revenues, nor is Applied Digital capable of providing $460 million worth of AI cloud services.

220.    Specifically, the Wolfpack Report revealed that Stability AI is run by Emad Mostaque, a "liar who exaggerated his academic credentials and mislead investors." Additionally, the Wolfpack Report revealed that, according to an article published in *Forbes,* Mostaque, "reportedly claimed that Stability AI had a partnership with Amazon, but that claim had reportedly been walked back by the company's spokesperson," and also "reportedly claimed that Stability AI was working with the WHO, OECD and the World Bank, but these organizations reportedly denied having any dealings with the company."   Another article, published by *Semafor* revealed that Stability AI was "burning through cash" and "slow to generate revenue," further stating that its financial condition was so poor that venture investors questioned "pouring more money into the struggling company."   According to the Wolfpack Report, Bloomberg also reported that "Stability AI struggled to raise funds at a $4 billion valuation and ended up raising just $25 million this spring with a convertible note."   Based on his in-depth investigative research, Mr. David concluded in the Wolfpack Report that, "In short, it looks like Stability AI doesn't have the money for this deal," further stating:

> It's a match made in heaven since Stability AI does not seem to have the money to purchase the GPUs it wants, and APLD does not have the infrastructure to place them. Yet by partnering up, they can potentially generate more hype and drive more fundraising, which appears to be the primary method of producing income for both companies.

221.    Additionally, the Wolfpack Report revealed the misleading nature of Applied Digital's press release announcing its purported collaboration with Hewlett Packard, demonstrating that the Company's AI cloud services business is nothing but smoke and mirrors.

67

222. The same day that Mr. David published the Wolfpack Report, the Bear Cave report, authored by Edwin Dorsey, entitled "Problems at Applied Digital (APLD)," stated, in relevant part:

> Applied Digital [. . .] claims to "design, develop and operate next-generation datacenters across North America to provide digital infrastructure solutions to the rapidly growing high performance computing industry." The Bear Cave believes Applied Digital relies on puffery over substance and is a perfect case study on our market's bizarre underbelly of reverse mergers, microcaps, and shell companies.

223. The Bear Cave Report further described the Company's many confusing pivots and the troublingly blurred lines between Applied Digital and B. Riley.

224. Following publication of the Wolfpack Research and Bear Cave Report, Applied Digital's stock price fell $1.27 per share, or 14.16%, to close at $7.70 per share on July 6, 2023.

225. Three weeks later, on July 26, 2023, The Friendly Bear published a short report, authored by Nathan Koppikar, entitled "B. Riley May Face Fallout from Applied Digital Governance Problems." The Friendly Bear Report stated, in relevant part:

- Recent developments suggest that B. Riley is controlling managerial decisions at Applied Digital to the detriment of Applied Digital shareholders

- After raising "low-cost" debt from B. Riley specifically for the purpose of "accelerating growth", Applied Digital turned around and paid the loan off almost two years ahead of contractual maturity, and at the exact time that B. Riley needed to raise cash for its FRG acquisition

- We do not believe that Applied Digital's board meets the independence requirements under Nasdaq rules and believe the Board is essentially controlled by B. Riley

- The CEO of APLD bought shares of APLD utilizing his B. Riley fund immediately in front of significant market moving news – we believe the Boards of both companies should probe these trades

- Given the clear conflicts of interest at play, the Audit Committee's alleged investigation into the CEO's sexual harassment could subject Applied Digital to significant legal blowback

Applied Digital represents one of the worst governance situations we have ever seen and we expect both APLD and RILY could face substantial litigation in the coming months due to severe disclosure and governance problems.  We question the judgment of partners that have decided to work with Applied Digital despite its internal control [] and governance problems.

226.    Mr. Koppikar also revealed that the shady Marcum LLP is the registered "independent" account firm for both B. Riley, its biggest client, and Applied Digital.

227.    The revelations in The Friendly Bear report caused Applied Digital's stock price to fall $0.60 per share, or 6%, over the following two trading sessions, to close at $9.40 per share on July 28, 2023.

228.    Even following publication of the scathing short seller reports, the Company continued to mislead investors regarding the nature of its business and the capabilities of its datacenter facilities in Ellendale and Garden City.

229.    On August 2, 2023, the Company filed its Form 10-K for the fiscal year ended May 31, 2023 ("2023 10-K"), signed by Defendants Cummins and Rench.  Therein, Defendants continued to refer to the Company's datacenters as next generation, continued to hype its purported cloud services customers and HPC capabilities, and continued to refer to the risk of power outages at its existing facilities as purely hypothetical.

230.    Specifically, Defendants once again stated that:

We are a designer, builder and operator of next-generation digital infrastructure. We have three primary business streams, artificial intelligence ("AI") cloud services, high performance computing ("HPC") datacenter hosting, and crypto datacenter hosting.

231.    The foregoing statements were false and misleading because the Company did not have next-generation digital infrastructure, did not have the experience, infrastructure, funds, or capacity to operate as an AI cloud service provider or to provide next generation datacenter hosting

for other HPC applications, and had no path to earning revenue in its HPC "business stream." *See* ¶¶70-112, *supra.*

232.    Additionally, the 2023 Form 10-K continued to tout the Company's signing of two AI cloud services customers through Sai:

> Our AI cloud services business operates through our Sai Computing brand and provides cloud services applicable to artificial intelligence.
>
> On May 15, 2023, we announced the formal launch of our AI Cloud services business through Sai Computing. On May 16, 2023, we announced that Sai Computing secured its first major AI customer with an agreement worth up to $180 million over a 24-month period. The customer will make a significant prepayment as part of the agreement.
>
> On June 23, 2023, we announced that Sai Computing had secured its second AI customer with an agreement worth up to $460 million over 36 months.

233.    Regarding the Company's purported $180 million cloud services customer, Defendants further stated in the 2023 Form 10-K that it had "confirmed receipt of a customer prepayment for its AI cloud services business of approximately $22.5 million," yet reported that for the fiscal year ended May 31, 2023 that it had earned 100% of its approximately $55 million in revenue from hosting services.

234.    The foregoing statements regarding the Company's purported AI cloud services customers were false and misleading because the Company did not have the experience, infrastructure, funds, or capacity to effectively operate as a cloud services provider and thus could not realize anywhere near $640 million in revenue from its two cloud services customers between June 2023 and June 2026.  Moreover, Defendants failed to reveal that Sai was not actually a separate company but solely existed on paper to provide the false illusion of a separate cloud services company that operated under the Applied Digital umbrella.

235.    The 2023 Form 10-K also once again characterized "power outages" in the Risk Factors section as a mere possibility:

> We <u>may</u> experience disruptions due to mechanical failure, power outage…Our systems <u>may</u> be susceptible to damage, interference, or interruption from … power loss…Such disruptions could materially and adversely affect our business and our financial condition, operating results, cash flows, and prospects.

236.    The foregoing statement was false and misleading because this disclosure of *hypothetical* risk did not inform investors that the risk of mechanical failure, power outage, damage, interference, or interruption from power loss that impact operations and revenues had already been triggered when the Company constructed its datacenters with subpar components, which included subpar transformers. *See ¶¶70-82, supra.*

237.    Moreover, Defendants touted that they had ordered 26,000 GPUs to run the Company's AI cloud services business and had already procured and deployed 1,024:

> In June, the Company expanded its commitment for up to 26,000 GPUs for the Company's AI Cloud services business. The Company has received and deployed an initial production cluster of 1,024 GPUs.

238.    The foregoing statements were false and misleading because Defendants failed to reveal that the Company did not have the experience, infrastructure, funds, or capacity they needed to operate as an AI cloud service provider, could not afford to purchase 26,000 GPUs, which at $40,000 apiece would have amounted to $140 million more than the Company's market capitalization at the time as evidenced by the fact that they admitted to needing to obtain financing to pay for the first 1,024 GPUs, and also could not obtain that quantity of GPUs as a result of supply chain issues.  *See ¶¶70-112, supra.*

239.    Defendants also falsely repeated their prior representations that the Garden City datacenter would ultimately "***provide 200MW of power to hosting customers***."

240.    The foregoing statements were false and misleading because Defendants failed to reveal to investors that the Garden City datacenter could never achieve a 200MW capacity and

that in fact the Company would have to imminently sell the Garden City datacenter for a loss, due to ballooning operating losses and negative gross profit. *See* ¶¶72-78, *supra*.

241.    In the 2023 Form 10-K, Defendants continued to represent that their experience with the "build out" and operating of the Jamestown datacenter provided the Company with "a repeatable power" strategy to use for its "pipeline of potential power sources across our sites in Jamestown, North Dakota; Garden City, Texas; and Ellendale, North Dakota."

242.    The foregoing statements were false and misleading because the Company's leadership had no relevant experience and built the Jamestown facility too quickly using subpar components, thus creating unsafe work conditions and an increased risk of power outages.  Given that the Company had repeated its "power strategy" based on the "build-out of our first North Dakota facility" when constructing the Garden City and Ellendale datacenters, Defendants knew or were reckless in not knowing that they faced the same risks of power outages in those locations.

243.    On October 9, 2023, the Company issued a press release announcing the Company's fiscal Q1 2024 financial results and providing an operational update, which again falsely described the Company as "a designer, builder, and operator of next-generation digital infrastructure designed for High-Performance Computing ("HPC") applications, artificial intelligence cloud services ("Cloud services"), and datacenter hosting ("Hosting").  The press release further quoted Defendant Cummins as stating:

> We are finalizing details for our Garden City facility and have a clear path now to reaching 500 MW across our three hosting facilities.

244.    The foregoing statements were false and misleading because the Company did not operate "next-generation digital infrastructure" capable of accommodating HPC applications or AI cloud services nor did the Company have a "clear path" to "reaching 500 MW across our three hosting facilities," because Defendants had shoddily constructed the datacenters using subpar

components that raised a risk of unsafe work conditions and power outages, the Garden City datacenter could never achieve a 200MW capacity, and the Company would have to imminently sell the Garden City datacenter for a loss, due to ballooning operating losses and negative gross profit. *See* ¶¶72-112, *supra*.

245.    The press release also provided a cloud services updated, stating:

Applied Digital's Cloud Service, offered through its wholly owned subsidiary Sai Computing, provides high-performance computing power for artificial intelligence and machine learning applications.

The Company has ordered 34,000 GPUs for the Company's Cloud services business. During the three months ended August 31, 2023, the Company received and deployed an initial production cluster of 1,024 GPUs, and began recognizing revenue on our first cloud services contract.

246.    The foregoing statements were false and misleading because Defendants failed to reveal that the Company did not have the experience, infrastructure, funds, or capacity needed to operate as an AI cloud service provider, Sai was not actually a distinct company but solely existed on paper to provide the false illusion of a separate cloud services company that operated under the Applied Digital umbrella, the Company could not afford to purchase 34,000 GPUs, which at $40,000 apiece would cost $460 million more than the Company's market capitalization, and also could not obtain that quantity of GPUs as a result of supply chain issues. *See* ¶¶70-112, *supra*. Indeed, the Company admitted it had to obtain financing to pay for the first 1,024 GPUs it had purportedly procured and deployed.

247.    Regarding the Company's HPC segment, the press release stated:

Applied Digital's HPC datacenter business designs, builds and operates next-generation datacenters designed to provide high computing power and support high-compute applications within a cost-effective model. The Company has over 300 MW of capacity in development, including 200 MW in North Dakota and 100 MW in Utah.

248.     The foregoing statements were false and misleading because the Company did not build or operate next-generation digital datacenters capable of hosting HPC applications, and did not have the experience, infrastructure, funds, or capacity to operate as an AI cloud service provider or to provide next generation datacenter hosting for other HPC applications."  *See* ¶¶70-112, *supra.*

249.     On January 16, 2024, the Company issued a press release announcing the Company's fiscal Q2 2024 financial results and providing an operational update.  The press release falsely described the Company as "***a designer, builder and operator of next-generation digital infrastructure designed for High Performance Computing ("HPC") applications, cloud services ("Cloud Services"), and datacenter hosting ("Datacenter hosting")***," and further quoted Defendant Cummins as stating, in relevant part:

> Our Garden City facility was energized in October, and ***we remain on track to reach 500 MW across our three hosting facilities in the near term***.

250.     The foregoing statements were false and misleading because Defendants did not have the experience, infrastructure, funds, or capacity to operate as an AI cloud service provider or to provide next generation datacenter hosting for other HPC applications, and regarding its Garden City datacenter, failed to reveal to investors that the Garden City datacenter would never be able to achieve a 200MW capacity and that in fact the Company would have to imminently sell the Garden City datacenter for a loss due to the Company's ballooning operating losses and negative gross profit. *See* ¶¶70-112, *supra.*

251.     Reporting on the cloud services segment, the press release further stated:

> Applied Digital's Cloud Services, offered through its wholly owned subsidiary Sai Computing LLC, provides high-performance computing power for artificial intelligence and machine learning applications.

252.     Reporting on the HPC segment, the press release further stated:

74

Applied Digital's HPC hosting business designs, builds, and operates next-generation data centers, which are designed to provide massive computing power and support high-performance computing applications within a cost-effective model.

253. The foregoing statements regarding the Company's cloud services and HPC segments were false and misleading because the Company did not have the experience, infrastructure, funds, or capacity to effectively operate as a cloud services provider or to host HPC applications aside from crypto mining, and further failed to reveal that Sai was not actually a separate company but solely existed on paper to provide the false illusion of a separate cloud services company that operated under the Applied Digital umbrella.

254. During the January 16, 2024 earnings call regarding the Company's Q2 2024 results, Wes Cummins touted dramatically improved cash flow from the crypto hosting segment of the Company stating, in relevant part:

> I think it's important to note that ***when we hit March 1, the cash flow from our Bitcoin datacenters improves dramatically***. Right? We burned through the vast majority of the prepayments at that point and so the cash flow from that portion of our business improves dramatically.

255. Moreover, Defendant Cummins touted the energization of the Garden City facility and a ramp up of operating cash flow from all three datacenters, stating in relevant part:

> During the quarter, we announced the initial energization of our 200-megawatt Garden City facility in Texas. This is a significant milestone in Applied Digital's ongoing efforts to meet the growing demand for low cost scalable digital infrastructure. ***The Garden City facility had a small contribution to our results this quarter and is currently operating at approximately 132 megawatts, with the remainder of the capacity expected to come online in the next several months***. As we brought on the facility, we realized there were additional infrastructure improvements needed for the grid. We expect these improvements to be made no later than April. Our customers continue to send miners to the facility and we are actively installing them. With the increase in the cost of bitcoin, we are seeing demand increase significantly for hosting services. As a reminder, our Garden City facility is fully contracted with fixed prices, so we are not exposed to volatility in the crypto markets heading into the halving event this year. ***Once our Garden City facility becomes fully energized, we will have approximately 500 megawatts of hosting capacity across our three datacenter hosting facilities. We expect our***

*three sites to deliver up to $300 million in revenue and $100 million of adjusted EBITDA on an annualized basis. Operating cash flow from datacenter hosting services will ramp up significantly in March as the majority of our prepayments burn off in February*.

256.    The foregoing statements regarding dramatic improvements to hosting cash flow, the success of the Company's three datacenters and available hosting capacity were false and misleading because Defendants failed to reveal that the Garden City datacenter would never achieve 200MW and that the Company would have to imminently sell the facility at a loss due to the Company's ballooning negative gross profit and a massive operating losses.

## THE TRUTH IS REVEALED

257.    Less than a month later, on February 9, 2024, Applied Digital disclosed in a Form 8-K that it experienced a power outage at its Ellendale datacenter hosting facility beginning on January 18, 2024.  As of February 6, 2024, Applied Digital determined that revenues from the facility will be materially impacted for the quarter ending February 29, 2024.

258.    The disclosure revealed a materialization of the risk that the Ellendale facility, on which the Company relied for a material percentage of its overall revenue, would experience an outage that would detrimentally impact the Company's revenues due to the subpar components, including transformers, with which it had equipped its datacenter hosting facilities.

259.    On this news, Applied Digital's stock price fell 8% to close at $4.85 the following trading day, on February 12, 2024.

260.    Finally, on April 11, 2024, after the market closed, the Company reported its financial results for Q3 2024, which revealed that the Company had suffered its worst quarter in at least two years as highlighted by its negative gross profit and a $34 million operating loss. Results missed guidance and the Company revealed that its GPU rollout was slower than previously represented.  Moreover, the Company revealed that though it had previously touted its

Garden City facility as capable of a 200MW capacity and had just stated on January 16, 2024 that it expected dramatic improvement in cash flow from all three of its crypto mining datacenters following beginning March 1, 2024, it had nevertheless sold the Garden City facility *for a $21.7 million loss*, in an apparent desperate move to buoy its distressed balance sheet.

261.   Regarding Ellendale, the press release the Company issued that day stated, in relevant part:

> During the quarter, Applied Digital encountered several challenges that impacted our financial performance due to facility power outages in our datacenter hosting business.

262.   The press release further revealed, that, "we have determined the failures were due to transformers not meeting industry standards," and that even three months after the outage, the Ellendale facility had only "been reenergized to approximately 14% of its full capacity." During the earnings call that day, Defendant Cummins revealed that 45 transformers, at a cost of $9 million required replacement.

263.   On this news, Applied Digital's stock price fell 11.7% to close at $2.71 the following trading day, on April 12, 2024 on unusually heavy volume.

264.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

265.   As the engineer behind Applied Digital's many pivots, Defendant Cummins possessed firsthand knowledge of the Company's capabilities, or lack thereof, to perform as a provider of AI cloud services and HPC applications aside from crypto mining.

266.    CW3 also stated that Defendants Cummins and Rench "absolutely knew" that they did not have the experience or infrastructure they needed to succeed as an HPC or AI cloud services company.

267.    CW2 alerted Defendants Cummins and Rench to the numerous issues plaguing the Jamestown facility, including power outages, via letter in the fall of 2022.  Defendants Cummins and Rench also knew about, and publicly spoke about, outages at the Jamestown facility.  Given that the Company had admittedly repeated its "power strategy" based on the "build-out of our first North Dakota facility" when constructing the Garden City and Ellendale datacenters, Defendants knew or were reckless in not knowing that they faced the same risks of power outages in those locations.

268.    CW2 also confirmed that Defendant Cummins knew that the datacenters did not qualify as "next generation."

269.    According to CW3, everybody, including Defendants Cummins and Rench, knew that the Garden City facility would never achieve 200MW as promised because "Texas did not want to give them 200MW of electricity…which is enough to power a small city." CW3 said the Garden City facility had a lot of issues with the connections, i.e. the breakers and metering, for the datacenter.  CW3 emphasized, based on communications to employees from Defendant Cummins and CW3s attendance at meetings that Defendant Cummins attended, that Defendant Cummins knew about these issues.

270.    CW3 also confirmed that Defendants Cummins and Rench both knew no partnership actually existed with Hewlett Packard when they issued the press release announcing a "strategic collaboration" on June 30, 2023.

78

271.    Defendant Cummins also possessed firsthand knowledge of his own, and his fellow Applied Digital Board members' conflicting loyalties and dual roles at the helm of both Applied Digital and B. Riley.

272.    As the signatory on the Loan and Security Agreement pursuant to which B. Riley loaned $36.5 million to Applied Digital, Defendant Rench had firsthand knowledge of the terms and applicable fees.

273.    Defendant Cummins is quoted in the May 19, 2024 press release announcing the loan, as stating:

> "We are happy to secure this commitment which allows us to accelerate our growth in high performance computing digital infrastructure and our new Sai Computing AI Cloud platform for which we continue to see unprecedented demand," said Applied Digital CEO and Chairman, Wes Cummins. "This additional funding is a continued endorsement of the strength of our business and illustrates our ability to secure low-cost, non-dilutive financing to fund a portion of our growth capital needs."

Defendant Cummins' quote demonstrates his personal knowledge of the terms of the loan, the representations made to investors about its purpose, and that it was "low cost."

274.    The 2023 Form 10-K, signed by Defendants Cummins and Rench demonstrates their knowledge of the rapidity with which the Company repaid the loan and the resulting fees to B. Riley.

275.    As President of B. Riley Asset Management, Defendant Cummins had access to information regarding B. Riley's acquisition of FRG and its capital needs to consummate the acquisition.

276.    As President of B. Riley Asset Management, Defendant Cummins also possessed a motive to inflate the price of Applied Digital securities.  For example, in his role as President of B. Riley Asset Management, which is wholly owned by B. Riley Financial, Defendant Cummins purchased 80,000 shares of Applied Digital during a period of low trading volume in April and

May of 2023, right before the Company announced it had secured its first two AI cloud services customers, causing the stock and trading volume to skyrocket.

277.   Additionally, on April 4, 2023, just a few weeks before the Company announced its first AI cloud services customer, "independent" directors Hastings, Miller, Moore, and Nottenburg each acquired 94,821 shares of Applied Digital stock which closed at $2.22 that day and soared to a high of $11.62 on June 23, 2023 in the wake of the Company's announcements.

278.   As further evidence of motive, during the Class Period Defendant Cummins sold or otherwise disposed of 107,066 shares of Applied Digital stock for proceeds of $450,973.  During the Class Period, Defendant Rench sold or otherwise disposed of 85,186 shares of Applied Digital stock for proceeds of $290,990.  During the Class Period, Director Virginia Moore sold or otherwise disposed of 1,270,712 for proceeds of at least $2,371,481, and Director Richard Nottenburg sold 14,820 shares of Applied Digital stock for proceeds of $114,707.

279.   Moreover, conflicted "independent" Board member and "independent" chair of the Nominating and Governance Committee, Virginia Moore, resigned from the Board, as the Company announced on February 22, 2024.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

280.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Applied Digital securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

281.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Applied Digital securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Applied Digital or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

282.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

283.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

284.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Applied Digital;

- whether the Individual Defendants caused Applied Digital to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Applied Digital securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

285.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

286.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Applied Digital securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Applied Digital securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

287.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

288.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## NO SAFE HARBOR

289.    The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

290.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## LOSS CAUSATION AND ECONOMIC LOSS

291.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Applied Digital publicly traded securities and operated as a fraud or deceit on purchasers of Applied Digital publicly traded securities. As detailed above, when the truth about Applied Digital's misconduct was revealed, the value of Applied Digital publicly traded securities declined precipitously as the prior artificial inflation no longer propped up the price of the securities. The decline in the price of Applied Digital publicly traded securities was the direct result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price decline negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants'

fraudulent scheme to artificially inflate the prices of Applied Digital publicly traded securities and the subsequent significant decline in the value of Applied Digital publicly traded securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

292.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiffs and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Applied Digital's business, operations, and financial results as alleged herein. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Applied Digital publicly traded securities to be artificially inflated. Plaintiffs and other Class members purchased Applied Digital publicly traded securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

293.    On July 6, 2023, Wolfpack Research issued its report authored by Dan David as detailed herein. Per Wolfpack Research's website:

> Dan has exposed billions of dollars in fraud against investors over the last 12 years. He has worked to change the political landscape in the United States for a fair Bilateral Investment Treaty (BIT) with China. For his efforts in Freedom of Speech activism, financial research and on-the-ground investment due-diligence, Dan has been featured in many major news outlets such as CNN, Fox Business, CNBC, Bloomberg Television, The New York Times, Wall Street Journal, South China Morning Post, Barron's and ABC's Nightline. He has also presented at Universities, including Columbia Business School and Wharton Radio. Considered an expert on China's markets and security, Dan has presented at prestigious think-tanks and conferences such as the Center for Strategic International Studies (CSIS), Ergo - Global Flashpoint, and the Sohn Investment Conference. Dan is featured as the lead protagonist in a ground-breaking documentary, "The China Hustle", which documents his work exposing fraud in China-based, U.S. listed companies.

294.    In the disclaimer accompanying the Wolfpack Report, Mr. David made clear that the report is not only based on generally available information but also on, "field research,

inferences and deductions through our due diligence and analytical processes."  The Wolfpack Research website explains its mission as follows:

> Through in-depth analysis and on the ground research of companies, industries, and the world economy, we have exposed billions of dollars of fraud on the markets. Wolfpack Research accurately reveals the complete picture of a company and more than just what management wants investors to see.

295.    Mr. David further made clear that, "To the best of our ability and belief, all information is accurate and reliable, and has been obtained from public sources that we believe to be accurate and reliable, and who are not insiders or connected persons of the applicable Securities covered or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer."

296.    Also on July 6, 2023, the Bear Cave issued a report as detailed herein, available by subscription and authored by Edwin Dorsey.  Edwin Dorsey, The Bear Cave's sole author, does not take positions against companies profiled in The Bear Cave.

297.    Upon the publication of the Wolfpack Report and the Bear Cave Report, Applied Digital's stock price fell $1.27 per share, or 14.16%, to close at $7.70 per share on July 6, 2023.

298.    Then, on July 26, 2023, The Friendly Bear published its report as detailed herein, authored by Nathan Koppikar.  While The Friendly Bear Report is based on publicly available information, it includes an analysis of that information not previously undertaken in the same manner by any other market participant.  Moreover, the opinion Mr. Koppikar reached as a result of his unique analysis was not publicly available prior to the publication of the report on July 26, 2023.

299.    Following publication of the Friendly Bear Report, Applied Digital's stock price fell $0.60 per share, or 6%, over the following two trading sessions, to close at $9.40 per share on July 28, 2023.

300.     Then, on February 9, 2024, Applied Digital disclosed in a Form 8-K that it experienced a power outage at its Ellendale datacenter hosting facility beginning on January 18, 2024.  As of February 6, 2024, Applied Digital determined that revenues from the facility will be materially impacted for the quarter ending February 29, 2024.

301.     The disclosure revealed a materialization of the risk that the Ellendale facility, on which the Company relied for a material percentage of its overall revenue, would experience an outage that would detrimentally impact the Company's revenues due to the subpar components, including transformers, with which it had equipped its datacenter hosting facilities.

302.     On this news, Applied Digital's stock price fell 8% to close at $4.85 the following trading day, on February 12, 2024.

303.     Finally, on April 11, 2024, the Company reported its financial results for the fiscal third quarter ended February 29, 2024, which revealed for the first time that though the Company had previously touted its Garden City facility as capable of a 200MW capacity and had just stated on January 16, 2024 that it expected dramatic improvement in cash flow from all of its crypto mining datacenters following May 1, 2024, it had nevertheless sold the Garden City facility *for a $21.7 million loss*, in an apparent desperate move to buoy its distressed balance sheet.  The Company also revealed that its Ellendale facility was operating at just 14% capacity following the power outage in February, which it revealed occurred as a result of subpar transformers.

304.     On this news, Applied Digital's stock price fell 11.7% to close at $2.71 the following trading day, on April 12, 2024 on unusually heavy volume.

305.     The revelations in The Wolfpack Report, The Bear Cave Report, The Friendly Bear Report, the February 9 Form 8-K, and the Q3 2024 disclosures contradicted statements and/or

revealed omissions Defendants made during the Class Period and were a causal element of the concurrent decline in the Company's share price.

## COUNT I

## (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

306.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

307.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

308.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Applied Digital securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Applied Digital securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

309.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for Applied Digital securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Applied Digital's finances and business prospects.

310.     By virtue of their positions at Applied Digital, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

311.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Applied Digital, the Individual Defendants had knowledge of the details of Applied Digital's internal affairs.

312.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Applied Digital. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Applied Digital's businesses, operations, future financial condition, and future prospects. As a

result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Applied Digital securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Applied Digital's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Applied Digital securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants and were damaged thereby.

313.    During the Class Period, Applied Digital securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Applied Digital securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Applied Digital securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Applied Digital securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

314.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

315.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

316.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

317.     During the Class Period, the Individual Defendants participated in the operation and management of Applied Digital, and conducted and participated, directly and indirectly, in the conduct of Applied Digital's business affairs.  Because of their senior positions, they knew the adverse non-public information about Applied Digital's misstatement of income and expenses and false financial statements.

318.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Applied Digital's financial condition and results of operations, and to correct promptly any public statements issued by Applied Digital which had become materially false or misleading.

319.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Applied Digital disseminated in the marketplace during the Class Period concerning Applied Digital's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Applied Digital to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of

Applied Digital within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Applied Digital securities.

320.    Each of the Individual Defendants, therefore, acted as a controlling person of Applied Digital.  By reason of their senior management positions and/or being directors of Applied Digital, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Applied Digital to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Applied Digital and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

321.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Applied Digital.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

91

Dated:  July 22, 2024                               Respectfully submitted,


                                                    **POMERANTZ LLP**

                                                    By: *s/ Tamar A. Weinrib*
                                                    Jeremy A. Lieberman
                                                    Tamar A. Weinrib (admitted *pro hac vice*)
                                                    600 Third Avenue, 20th Floor
                                                    New York, New York 10016
                                                    Telephone:       (212) 661-1100
                                                    Facsimile:        (917) 463-1044
                                                    Email: jalieberman@pomlaw.com
                                                    Email: taweinrib@pomlaw.com

                                                    *Lead Counsel for Plaintiff and the Class*

                                                    **THE BRISCOE LAW FIRM, PLLC**

                                                    By: *s/ Willie C. Briscoe*
                                                    State Bar Number 24001788
                                                    12700 Park Central Drive, Suite 520
                                                    Dallas, Texas 75251
                                                    Telephone: 972-521-6868
                                                    Facsimile: 281-254-7789
                                                    Email: wbriscoe@thebriscoelawfirm.com

                                                    *Liaison Counsel for Plaintiff*


                                                    **BRONSTEIN, GEWIRTZ**
                                                    **& GROSSMAN, LLC**
                                                    Peretz Bronstein
                                                    60 East 42nd Street, Suite 4600
                                                    New York, NY 10165
                                                    Telephone: (212) 697-6484
                                                    Email: peretz@bgandg.com

                                                    *Additional Counsel for Plaintiff*